**Ernest MITZNER et al., Plaintiffs,**

v.

**CARDET INTERNATIONAL, INC.,
etc., et al., Defendants.**

**No. 73 C 125.**

United States District Court,
N. D. Illinois, E. D.

May 17, 1973.

Ronald Goldberg, DePaul Law Clinic, Chicago, Ill., for plaintiffs.

Robert A. Tingler, Freeman and Tingler, Chicago, Ill., for defendant M. L. C.

## MEMORANDUM OPINION

DECKER, District Judge.

Ernest Mitzner, Corinne Mitzner, Eugene Hoadley and Betty Hoadley filed this action on behalf of themselves and all other licensees of Cardet International, Inc. ("Cardet"), against Cardet, certain of its officers, employees and agents and M.L.C. Corporation, Inc. ("M.L.C."), a finance company. The amended verified complaint (hereinafter "the complaint") alleges that Cardet sold plaintiffs "investment contracts" called "franchises", in interstate commerce, in the form of "Distributor" and "Area Manager" licenses. Essentially, the allegations in the complaint charge that defendants induced plaintiffs to purchase the foregoing franchises through false and misleading representations, which defendants knew to be false and misleading, and further failed to file a registration statement, all in violation of the Securities Act of 1933 and the Illinois Securities Act of 1953. See,

15 U.S.C. § 77f et seq.; Ill.Rev.Stat. ch. 121½, § 137.5 et seq. The liability of defendant M.L.C. is founded on the allegation that M.L.C. "directly or indirectly controlled or was controlled by" Cardet and directly or indirectly participated in the distribution of unregistered securities by Cardet. Defendant M.L.C. has moved to dismiss the complaint.

M.L.C. urges two grounds in support of its motion. First, it contends that the franchises or license agreements sold by Cardet are not "securities" under the federal securities act, and, therefore, the complaint fails to state a cause of action. Secondly, M.L.C. argues that even if the Cardet license agreements are "securities", the alleged activities of M.L.C. do not constitute violations of the securities acts.

■ At the outset, this court would reiterate the axiom that when ruling on a motion to dismiss, the court must accept all well-pleaded allegations of fact as being true. Hence, although the memoranda filed indicate a sharp dispute as to the actual facts, for purposes of this motion the court must accept as true the facts as they are stated.

The threshold question is whether the license or franchise agreements sold by Cardet to plaintiffs are "securities" under the Securities Act of 1933, § 2(1). See 15 U.S.C. § 77b(1). Before that question can be answered, it is necessary to examine in some detail the nature of the transactions alleged to constitute the sale of securities in this case.

According to the complaint and the attached exhibits, Cardet advertised for persons interested in becoming "distributors" and "area managers" for Cardet's "Marketing Plan". The plan supplied to prospective participants in a sales brochure is described therein as follows:

"We offer to the consumer a magnificent selection of top quality products through a unique delivery service. Each month the residents in your area know that they can look forward to a new selection of products. They will find our brochures, delivered by you

or your carriers, in a handy plastic container, hung on their front doorknob or handle. The residents in your area will be able to order these beautiful products right from the convenience of their own home, instead of the inconvenience of having to fight traffic, crowds, and the impersonal treatment they receive in the stores.

. . . . . .

"Once a month you will supervise carriers who will deliver to each dwelling in your territory a magnificent selection of products displayed in attractive brochures.

. . . . .

"Your customers will send their orders directly to you, and you will forward them to the Company. The Company will then ship to you, the products ordered, for delivery. At that time you will also receive your Earnings Check of 25%.

"It will take 5 Hours of your time each week, to properly administrate and supervise your business activities."

In accordance with the foregoing marketing plan, Cardet offered two types of license agreements to prospective investors, each at a cost of $5,000.00, with 100% financing available.

The Distributor Agreement provides that an exclusive territory will be assigned to the distributor in conjunction with the right to deliver product brochures to a given minimum number of residences in the territory "for a perpetual period" unless terminated by breach or default. It is further provided that Cardet will furnish all necessary training to the distributor, provide all carrier agreements, employment applications, order forms, brochures, business cards, accounting books, etc., promote good will and public relations and pay a 25% commission on the gross sales obtained by the distributor.

The distributor, in turn, must, in addition to paying a $5,000.00 license fee to Cardet, hire and train carriers to make deliveries, "comply with all rules and procedures of Company set forth in any manual of operations, and to obey all instructions and procedures adopted and from time to time amended by the Company", attend training seminars, file reports on company-provided forms, devote such time as is necessary to deliver all of the company brochures and to refrain from making any deliveries outside his area or delivering anything but Cardet products within his area. The distributor may not "compete" with Cardet within his area for a period of five years. There is a vague obligation to work with "civic and business groups to promote the good name of Cardet" and work with company representatives in promoting the business. The agreement states that the relationship of the distributor with Cardet is one of an "independent contractor".

The "Area Manager" Agreement is in all relevant respects similar to the distributor agreement, except that the "Area Manager's" principal responsibility is to recruit distributors, although Cardet agreed to advertise locally to assist the "area managers" in performing that function.

Plaintiffs Ernest and Corinne Mitzner allege that on or about May 5, 1972, they entered into a distributorship agreement with Cardet and borrowed $9,900.00 from M.L.C. in order to finance the transaction. They further allege that both Cardet and M.L.C., through their representatives, made false and misleading statements which induced plaintiffs to enter into the agreement. Plaintiffs Eugene and Betty Hoadley entered into an "area manager" agreement on or about May 22, 1972, and borrowed $9,900.00 from M.L.C. in connection therewith. Accordingly, the Mitzner and Hoadley plaintiffs are each asking for judgment in the amount of $9,900.00 plus interest and punitive damages in the amount of $25,000.00.

■ The first question is whether the sale of the foregoing distributorships and area managerships were sales of "securities" under the Securities Act.

Plaintiffs argue that the license agreements involved in this case were "investment contracts" and are, therefore, within the definition of "securities" under the Securities Act. Although the term is not specifically defined in the statute, the Supreme Court in S.E.C. v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), announced its now well-known definition of an investment contract:

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301, 66 S.Ct. at 1104.

In *Howey* the Court held that a land sales contract for units in a citrus grove, together with a service contract for cultivating and marketing the crops was an "investment contract" and, therefore, a security. Both state and federal courts have consistently held that various schemes, designed to attract investment money, involved the sale of "securities".[1] In that connection it is important to repeat the oft-cited language adopted by the Supreme Court in order to guide the lower courts in making determinations in these matters.

". . . the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms of courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security."'" S.E.C. v. Joiner Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943).

". . . in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

Finally, as the Supreme Court stated in the *Howey* case, the definition of a security

"embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. at 1103.

See also, Continental Marketing Corporation v. S.E.C., 387 F.2d 466 (10th Cir. 1967).

There can be little doubt that the amended complaint and the exhibits attached thereto allege a plan by Cardet to attract investment money for a "common enterprise". The word "investment" is used several times in the advertising brochure. The common enterprise is, of course, the marketing of Cardet's products. The difficult question here concerns the second prong of the *Howey* test: namely, whether profits are to be realized "solely from the efforts of others". M.L.C. argues that since the area managers and distributors were required by their agreements with Cardet to perform certain services, the profits they would receive from Cardet sales were *not* derived *solely* from the efforts of others.

Several state courts have suggested alternative tests for defining "investment contract". At least one court has stated that the *Howey* test is "too mechanical" and not sufficiently broad to serve the remedial purposes of the securities acts. See, State of Hawaii v. Hawaii Market Center, Inc., 485 P.2d 105 (Sup.Ct.Hawaii 1971). As an alternative, the "risk

---

1. See, *c. g.*, S.E.C. v. Glen W. Turner Enterprises, Inc., 474 F.2d 476, 481 n. 6 (9th Cir.) for a list of federal decisions. See also, Hawaii v. Hawaii Market Ctr., Inc., 485 P.2d 105 (Sup.Ct.Hawaii 1971); Healy v. Consumer Business System, Inc., 482 P.2d 549 (Ore.App.1971); Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961); *Cf.* Polikoff v. Levy, 55 Ill. App.2d 229, 204 N.E.2d 807 (1965).

capital" theory has been introduced in order to bring within the definition of securities, the sale of interests in enterprises which might involve some participation by the investor or profit by a third party. State ex rel. Healy v. Consumer Business System, Inc., 5 Or.App. 19, 482 P.2d 549 (1971); State of Hawaii v. Hawaii Market Center, Inc., *supra*; Silver Hills Country Club v. Sobieski, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). *Cf*. Mr. Steak v. River City Steak, 324 F.Supp. 640, 647 (D.Colo.1970), aff'd 460 F.2d 666 (10th Cir. 1972), where the court suggested that the "risk capital" theory be limited "to situations where exceptionally high risk, speculative franchises are involved". But see, Wieboldt v. Metz, 355 F.Supp. 255 (S.D.N.Y.1973); Chapman v. Rudd Paint and Varnish, 409 F.2d 635 (9th Cir. 1969). With regard to franchises in particular, several commentators have urged that a more flexible approach than the "solely from the efforts of others" test is necessary. Goodwin, "Franchising in the Economy: The Franchise Agreement as a Security under Securities Acts, Including 10b–5 Considerations", 24 Bus.Lawyer 1311 (1969); Note, "Franchises and Founders' Contracts: Securities or Not?" 8 Idaho Law Review 146 (1971); Comment, "The Franchise Agreement: A Security for Purposes of Regulation", U. of Ill. Law Forum 1970; Note, "The Franchise as a Security: Application of the Securities Laws to Owner-Operated Franchises", 11 Boston College Industrial & Commercial Law Review 228 (1970); *cf*. Case Note, 24 Vanderbilt Law Review 638 (1971).

Irrespective of the merits of the "risk capital theory", it is the opinion of this court that the language "solely from the efforts of others" must be read in the context of the *facts* of the *Howey* case and the consistently expansive language used by the Supreme Court in interpreting the Act, and the definition of "security", in particular. Hence, the word solely should not be interpreted or applied in a vacuum. Otherwise, schemes

that Congress clearly intended to be covered by the Securities Act will escape regulation merely by requiring some effort, no matter how small, on the part of the investor. See, S.E.C. v. Addison et al., 194 F.Supp. 709 (N.D.Tex.1961).

Recently, the Ninth Circuit Court of Appeals held that a plan requiring investors to recruit new prospects and sell new memberships in an organization was a "security". S.E.C. v. Glenn W. Turner Enterprises, Inc., et al., 474 F.2d 476 (9th Cir. 1973).

"For purposes of the present case, the sticking point in the *Howey* definition is the word 'solely,' a qualification which of course exactly fitted the circumstances in *Howey*. All the other elements of the *Howey* test have been met here. There is an investment of money, a common enterprise, and the expectation of profits to come from the efforts of others. Here, however, the investor, or purchaser, must himself exert some efforts if he is to realize a return on his initial cash outlay. He must find prospects and persuade them to attend Dare Adventure Meetings, and at least some of them must then purchase a plan if he is to realize that return. Thus it can be said that the returns or profits are not coming 'solely' from the efforts of others.

"We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities. . . .

"Strict interpretation of the requirement that profits to be earned must come 'solely' from the efforts of others has been subject to criticism.

*See, e. g.,* State of Hawaii v. Hawaii Market Center, Haw.1971, 485 P.2d 105. Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract. It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the Plan or Adventure is an investment contract. To do so would not serve the purpose of the legislation. Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

. . . . . .

"Our holding in this case represents no major attempt to redefine the essential nature of a security. Nor does our holding represent any real departure from the Supreme Court's definition of an investment contract as set out in *Howey*. We hold only that the requirement that profits come 'solely' from the efforts of others would, in circumstances such as these, lead to unrealistic results if applied dogmatically, and that a more flexible approach is appropriate." 474 F.2d at 481–483.

This court does not wish to be understood as establishing any general rule for franchises. However, it is clear that the circumstances of this case require an analytical rather than a purely mechanical application of the *Howey* test. In that connection, this court notes with interest Securities Act of 1933 Release No. 5211 (November 30, 1971), where the Commission specifically states that the sale of "multi-level distributorships" and "pyramid sales plans" "often involves the offering of an 'investment contract' or a 'participation in a profit sharing agreement', which are securities within the meaning of Section 2(1) of the Securities Act of 1933". The plans described in the release closely parallel the Cardet Marketing Plan. The Commission states that:

"It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negative the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action or where the duties assigned would in any event have little direct effect upon receipt by the participant of the benefits promised by the promoters, a security may be found to exist. As the Supreme Court has held, emphasis must be placed upon economic reality. See Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293 [66 S.Ct. 1100, 90 L.Ed. 1244] (1946). While the Commission has not taken the position that a franchise arrangement necessarily involves the offer and sale of a security, in the Commission's view a security is offered or sold where the franchisee is not required to make significant efforts in the operation of the franchise in order to obtain the promised return."

Although this court is not bound by the Commission's pronouncements, its comments in regard to multi-level distributorship schemes are persuasive.

Apart from the S.E.C. analysis, it is this court's opinion that the plan alleged in the complaint and reflected by the license agreements attached as exhibits satisfies the *Howey* test in all important respects. Distributors and area managers contribute substantial amounts of money to the licensor (Cardet) in return for the expectation of profiting from the sale of products marketed by Cardet. The area managers are essentially responsible for recruiting distributors, and distributors are essentially responsible for finding people to deliver Cardet's brochures, pick-up orders and deliver any goods sold. While the success of the enterprise is to some extent depend-

ent upon the distributor or area manager performing a purely mechanical task, the investor is not, in any real business sense, the master of his own destiny. Cardet selects, markets, advertises and otherwise controls the type, quality and nature of the goods it sells. The distributors and area managers are bound by any and all rules or procedures promulgated by the company and are not, at least from what is apparent at this stage of the proceedings, in a position to make any meaningful or independent *business* decisions. Without the benefit of any specific evidence, the efforts of the franchisee-licensee in this case appear to be purely *ministerial*. In fact, the advertising brochure emphasizes the fact that no experience is necessary, "No long hours! No hard laborious work!", and that "Your investment includes" a "thoroughly researched market in a booming industry", "continuous advertising and sales promotion", "continuous guidance and consultation". *Cf.* Wieboldt v. Metz, *supra*, 355 F.Supp. at p. 261.

Hence, applying the test announced in the *Glenn W. Turner* case, the amended complaint alleges the sale of a security as defined by the Act.

 The next question is whether the amended complaint states a cause of action against M.L.C. Plaintiffs contend that M.L.C. is a participant in the overall plan to market unregistered securities to such an extent that it is liable for damages. In that regard, the complaint alleges that M.L.C. "directly or indirectly controlled or was controlled by Cardet", that M.L.C. made certain false representations about Cardet to induce plaintiffs to borrow money to purchase investment contracts[2] and approved the applications for Cardet licenses before prospective licensees even approached M.L.C. for a loan and otherwise participated with Cardet in the sale of franchise license agreements. Although plaintiffs' allegations are somewhat vague, they are entitled to liberal construction, and on that basis do sufficiently allege "participation" by M.L.C. in the distribution of Cardet franchises. This does *not* mean that when a person lends money to a third party for purchase of an unregistered security, the lender "participates" in the distribution of a security. On the contrary, such an allegation, without more, would clearly be insufficient. See, *e. g.*, Cobb v. Uplands Hardware Corp., 68 Ill.App.2d 158, 215 N.E.2d 298 (1966). However, more has been alleged here. Plaintiffs allege that M.L.C. approved license applications, not just loan applications, was in a control relationship with Cardet,[3] *and* actively induced applicants to purchase the franchises by making statements about Cardet. Hence, the plaintiffs' injury might well have flowed "directly and proximately" from M.L.C.'s actions. Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964). Although the foregoing represents a liberal reading of the complaint, and plaintiffs' theory might

---

2. S.E.C. Release No. 5211, *supra*, states:
 "Moreover, any person who participates in the distribution of these securities may be a broker as defined in Section 3(a)(4) of the Securities Exchange Act of 1934 and, unless an exemption is available, would be required to register as such pursuant to Section 15(a)(1) of that Act. For example, this might include, among others, persons who, for a finder's fee, commission, bonus or other compensation, induce others to become participants in the plans for the purpose of recruiting still other participants."
 See also, S.E.C. v. Chinese Consol. Benev. Assoc., Inc., 120 F.2d 738 (2d Cir.), cert.

denied, 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941).

3. Rule 405 of the General Rules and Regulations under the Securities Act of 1933 provides that:
 "The term 'control' (including the terms 'controlling,' 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the *direction of the* management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

be somewhat attenuated, the record is undeveloped, and this court believes that the complaint against M.L.C. should not be dismissed at this stage. See, Safeway Portland Employees Federal Credit Union v. C. H. Wagner & Co., 335 F. Supp. 116 (D.Ore.1971).

Accordingly, defendant M.L.C. Corporation's Motion to Dismiss is denied.