Mary STANLEY, Plaintiff,

v.

COMMERCIAL COURIER SERVICE, INC., a Washington Corporation, et al., Defendants.

Civ. No. 72–931.

United States District Court, D. Oregon.

April 29, 1975.

Timothy L. Ryan, Goode, Goode, Decker & Hinson, P. C., Albany, Or., for plaintiff.

Brad Littlefield, Goldsmith, Siegel & Engel, Portland, Or., for defendants.

## OPINION

SKOPIL, District Judge.

Plaintiff, Mary Stanley, an Oregon resident, brings this action against Commercial Courier Service, Inc. (Courier), a Washington corporation, and several of its employees. Plaintiff seeks damages and re-

scission of a purchase she made from defendants of an alleged security. 15 U.S.C. § 77v; 15 U.S.C. § 78aa; ORS Ch. 59. In the alternative, she seeks enforcement of a settlement agreement. 28 U.S.C. § 1332. Defendants, other than defendant H. Miller, have moved to dismiss on the grounds that there is no genuine issue of material fact, for failure to state a claim, and for lack of subject matter jurisdiction. Rule 12(b)(6) Fed.R.Civ.P. In the alternative, they move for summary judgment, as does the plaintiff. I will therefore consider the motions under Rule 56.

The amended complaint (complaint) alleges that Courier sold plaintiff a franchise designated a "Master-Distributor Agreement". Defendants are charged with inducing the purchase through representations which they knew were false and misleading and with failing to file a registration statement. Plaintiff advanced $25,000 cash toward the $50,000 agreed price and executed a non-interest bearing promissory note for the balance. The balance was to be paid from sales of "Sub-Distributor Agreements".

Courier was a proposed scheme to provide delivery of advertising matter and sample merchandise for businesses to residences through a franchise system. Master Distributorships were sold in consideration of the exclusive right to delivery within a designated area and for various services supplied by Courier. Master Distributors agreed to parcel out their territories to "Sub-Distributors" as they deemed necessary to "fully comply with all contracts made (with advertisers by Courier and by the Distributors)" in their respective areas.

Courier was careful to disclaim any responsibility for the Distributors' success or failure. The Master-Distributorship Agreement provided that:

"DISTRIBUTOR acknowledges that he is an independent contractor and will operate the territory as his own business, under his own control and authority, except as to the requirements of performance as may be herein contained, and is not and will never be construed as an employee, agent, representative, or have any other affiliation with the COMPANY. Further DISTRIBUTOR acknowledges that he is independent and not dependent upon the COMPANY for revenue, business nor services, *nor does he look to the COMPANY for return of any investment* made in connection with this MASTER DISTRIBUTOR AGREEMENT, but acknowledges that such return, if any, will be directly dependent upon his own services, performances and abilities." (emphasis added)

Other provisions indicate that the relationship between Company and Distributor was more symbiotic than that paragraph supposed. Courier agreed

"To furnish the DISTRIBUTOR with instructions to establish delivery routes, methods of selecting qualified carriers and delivery procedures, and to supply DISTRIBUTOR prepaid and delivered F.O.B. designate (courier bags and caps, at cost and all necessary COMPANY forms) in sufficient quantity to meet the needs of DISTRIBUTOR and his SUB-DISTRIBUTORS. The COMPANY further agrees to furnish a three week training program by using COMPANY personnel in the setting up, and operation of his advertising department and 3 weeks in setting up and organizing his route and distribution department.

"The COMPANY, however, shall have no continuing responsibilities for the business to be conducted by the DISTRIBUTOR."

The last sentence quoted is also misleading. Courier was to advertise its business in a manner designed to "enhance the successful operation of the COMPANY's business *and* the business of it's [sic] DISTRIBUTORS". (emphasis added) It also was to provide brochures, catalogues, stationery, and forms.

In addition to her $50,000 license fee, plaintiff was obligated to hire and train carriers to make deliveries, "comply with all rules, procedures, policies and delivery price schedules . . . set forth in any writ-

ten memorandum issued to its DISTRIBUTORS", establish and maintain office and storage facilities, pay overhead and expenses, allow Courier to audit her books whenever it pleased, indemnify Courier against any liability that might be incurred because of her conduct or that of her employees, and file weekly delivery and distributorship sales reports with Courier. She was forbidden to make deliveries outside her area, deliver anything but advertising material, or to compete with Courier in any similar business within one hundred miles of any Distributor's area for five years after termination of her Agreement.

She agreed to pay Courier ten percent of the gross sum she received from. Sub-Distributorship license fees, as well as ten percent of the proceeds from advertising delivered within her territory. If advertising she solicited was delivered outside her territory, she was entitled to a commission.

Among the "GENERAL PROVISIONS" of the Agreement it was stated that Courier made no guarantee of the quantity of materials delivered nor the success of any distributorship.

Plaintiff seeks damages equal to the amount paid for the Distributorship, with interest from the date of purchase, costs paid pursuant to the Agreement, and for attorneys' fees.

The major issue is whether the sale of plaintiff's Distributorship was a security sale under federal or Oregon law. Plaintiff contends the Distributorship was an "investment contract" within the meaning of securities law.

The *Howey* test of an investment contract, which is generally applied, is

" . . . whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

Defendants argue that the terms of the Agreement, particularly those in which Courier explicitly disclaimed any guarantees of or responsibility for the success of

the Distributorship and stressed that the welfare of the Distributorship depended entirely on the Distributor's own efforts, indicate that the franchise is not a security. *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635 (9th Cir. 1969); *Bitter v. Hoby's International Inc.*, 498 F.2d 183 (9th Cir. 1974). Defendants argue that the Courier franchise system did not place franchisees in a position which the securities laws propose to protect. The Agreement expressly obviates the possibility that plaintiff could expect a return of profits "solely from the efforts of others".

Defendants contend that even if a liberal construction of "solely" were applied, the Distributorship was not an investment contract. Under the interpretation of *Howey* adopted in *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), whether a security exists depends upon

"[W]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which effect the failure or success of the enterprise."

Judging from the terms of the Agreement, plaintiff obviously did not anticipate profits "solely" from the efforts of others. It is less clear from that document whether Courier or its franchisees were to render the "undeniably significant" efforts or whether plaintiff assumed real control over the destiny of her enterprise.

Courier was the brain child of Homer Brand, who conceived it as a type of independent postal service. A very unsophisticated businessman, he incorporated Courier with the help of some friends and began soliciting advertising in the Seattle area. A comrade, Mr. Miller, became excited about Brand's basic concept but considered his business methods ponderous. Mr. Miller felt that the key to success in the business was rapid expansion into a nationwide system, which required enfranchisement. He dazzled Brand with diagrams of his scheme for a growing empire. The "distributorship" system was born.

The growth plan for the system contemplated three stages. The first consisted of franchise sales; the second, of advertising sales; and the third, of delivery. Courier retained careful control of its distributors, particularly during the initial development of a Master Distributorship. Written guidelines dictated their formative structures. These guidelines were detailed. Even the dimensions of the buildings to be rented were specified. Later Courier would send in a man to sell Sub-Distributorships for the Master Distributors. After the delivery force was recruited, advertising men were sent in to hire and train advertising sales people.

Control over the franchises did not lapse after the development stages. Distributors were subject to any and all directives from Courier. Through the medium of their franchises they were also financially interdependent upon each other. The Distributors enjoyed a share of profits from deliveries made by them for advertising solicited elsewhere, or vice versa. The importance of regional or national expansion, which never actually materialized, is obvious.

The economic realities of this franchise should determine whether securities are involved. That context alone provides a reliable measure of the extent of the franchisee's participation under the franchise agreement. In *Bitter v. Hoby's International, Inc., supra,* for example, a realistic appraisal of a hot roast beef franchise convinced the Court that despite the strict contractual controls imposed by the franchisor, each franchisee was a "relatively independent economic entity". The franchisee was not inextricably linked to the franchisor for his economical survival. If liberated from the franchisor, the restaurant could have obtained supplies and services from other sources and continued business.

By contrast, the Courier franchise was a delivery service. It sought national expansion. The interstate nature of the franchise had significance to the Courier franchisee not present in *Hoby's.* Courier

franchisees invested in a revenue sharing plan for extraterritorial deliveries and agreed that they and the franchisor would be making contracts to be performed wholly or in part by one another.

But I cannot conclude that this interdependence was of such importance that if the franchisor failed, the franchisee would also fail. Courier never realized its expansion goals. The extent to which a franchisee would have become reliant upon interstate business arranged through the franchisor remains a matter of speculation.

Theoretically the franchisee could have continued business on her own. Deliveries contemplated were of advertising material, which could be solicited from local businesses as well as regional or national ones. Interstate service was not indispensable. Consequently I must conclude that the Courier franchise was not a security under federal law.

I now reach plaintiff's claim under the Oregon Securities Law. The threshold question is whether those claims should be subject to the traditional *Howey* test or whether the "risk capital" test should be applied. Several state courts and commentators have criticized the *Howey* test as being too mechanical to adequately serve the broad policy purposes of the securities law. See Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula? 18 W.Res.L.Rev. 367 (1967); *Securities & Exchange Commission v. Latta,* 250 F.Supp. 170 (N.D.Cal.1965), *cert. denied,* 384 U.S. 940, 86 S.Ct. 1459, 16 L.Ed.2d 539 (1966). The most prevalent complaint has been the "solely from the efforts of others" requirement.

The risk capital test initially grew out of disaffection with the *Howey* requirement that the investor have some right or expectation of "profits" from the enterprise. In *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961), the state corporation commissioner stopped a sale of memberships to a country club on the basis that the memberships were unregistered securities. Corp.Code

§ 25500. The country club financed its purchases of real property and improvements almost exclusively with revenue from membership sales. The price of memberships was to increase as more facilities were added. Although a member had no contractual right to the income or assets of the club, he did have an irrevocable right to use club facilities. The Court held this sufficient to qualify memberships under the statutory definition of "beneficial interests in title to property" as securities. Corp. Code § 25008. The Court acknowledged that other courts had held that a sale of services was not a security. But it stated that unlike ordinary sales of a right to use existing facilities, the case at bar involved solicitation of risk capital in order to build and develop a new business for profit. Consequently it fell within the regulatory provisions of the state act.

> " . . . 'the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.' " *Silver Hills, supra* at 908, 13 Cal.Rptr. at 188, 361 P.2d at 908, quoting Dahlquist, "Regulation and Civil Liability Under the California Securities Act", 33 Cal.L.Rev. 343 (1945).[1]

The Supreme Court of Hawaii adopted a form of the risk capital test because of its disenchantment with the *Howey* requirement that the investor "expect profits *solely* from the efforts of others." *State Com'r of Securities v. Hawaii Market Ctr., Inc.,* 52 Haw. 642, 485 P.2d 105 (1971). The Court declined the alternative of applying a liberal construction to the *Howey* formula. It felt that the risk capital test better enabled it to apprise the economic realities of an investment contract. Under the *Howey* test the tentacles of securities regulations might be eluded by requiring the investor to contribute some insignificant effort to the scheme and frustrate the purpose of securities law to prevent fraud and to protect the public from fragile promotional gimmicks. See *S.E.C. v. Addison, et al.,* 194 F.Supp. 709 (N.D.Tex.1961). The Court proposed to obviate that possibility by rejecting the "solely" inquiry. Instead, its risk capital test questions whether the investor exercises "practical and actual control over the managerial decisions of the enterprise." *State Com'r of Securities, supra* at 109. The nature of that test reflects the central characteristic of a security as a "public solicitation of venture capital to be used in a business enterprise." *Hawaii Market Ctr., supra,* citing *Silver Hills.*

The Oregon Court of Appeals apparently expanded the dimensions of the risk capital test in *State Ex Rel Healy v. Consumer Business Systems, Inc.,* 5 Or.App. 19, 482 P.2d 549 (1971), (CBS).[2] The *Howey* definition of securities had previously determined Oregon securities cases. See *Sperry & Hutchinson Co. v. Hudson et al.,* 190 Or. 458, 226 P.2d 501 (1951); *State v. Whiteaker et al.,* 118 Or. 656, 247 P. 1077 (1926). In *CBS* the Oregon appellate court was confronted with a franchise scheme which did not satisfy the "solely" aspect of the *Howey* test. Dicta from *Sperry & Hutchinson Co., supra,* encouraged it to break out of the confines of that test in order to apprise the facts of *CBS* in a more realistic economic light.

The Court ruled that "if a substantial portion of the initial capital which a franchisor uses to initiate its operations is being provided by the franchisees" the franchise was a security. A new dimension was added to the risk capital test by the Court's statement that an investor need not derive profit solely, or even *substantially,* from the

---

1. The Court also noted that the California Securities Act could apply even if capital were invested without expectation of *any* material benefits. *Silver Hills Country Club, supra* 55 Cal.2d at 908, 13 Cal.Rptr. 186, 361 P.2d 906.

2. Although that Court was aware of the ruling in *Hawaii Market, supra,* the opinion in that case was not available when it decided *CBS.* Note 7, 482 P.2d 552, *supra.*

efforts of others. 482 P.2d 555. Dicta in *Silver Hills* indicated that the California security laws applied even where there was no expectation of any material benefits from the scheme, but that comment apparently derived from express language in the state statute. 361 P.2d at 908; Cal.Corp. Code § 25102. In any event, the Oregon version limits its inquiry in franchise cases to "whether the franchisor is depending on the investor for a substantial portion of the initial capital needed to start the enterprise." 482 P.2d 555.

The risk capital tests adopted in the states mentioned were spawned by disgruntlement with "mechanical" applications of the *Howey* test which are no longer dominant, at least at the federal level. Since the "risk capital cases" were written, the judiciary has become increasingly aware that new, irregular, or extraordinary investment schemes could frustrate the securities laws by escaping the confines of the *Howey* formula. Courts have generally reacted by adjusting their perspectives of the *Howey* defined securities laws. See *S.E.C. v. Glenn W. Turner Enterprises, Inc., supra.*

■ Consequently the risk capital test and the new "significant efforts" *Howey* test are essentially the same. Both discard form for an enlightened view of economics in their pursuit of the meaning and scope of the word "security".[3] The key to investment contracts under either approach is whether the investor remains a "master of his own destiny" or whether he relinquishes the "practical and actual control over the managerial decisions of the enterprise" to others.[4]

■ The tests are not synonymous, however. Despite the general similarity between the two tests, strict application of the risk capital formula to the facts at bar

compels me to conclude that a state security is involved although a federal one is not. Insufficient evidence of the extent of the franchisee's actual economic reliance upon the franchisor precluded me from recognizing the existence of a federal security. Oregon's version of the risk capital test does not appear to impose a similar constraint because it examines the franchise at an earlier stage to determine if it involves a security.

In *CBS*, the risk capital test determined that a security existed because the franchisor raised a substantial portion of his initial capitalization (the "risk capital") through solicitation of franchise fees. The franchisor was dependent upon these fees for both developmental and operating expense. Beyond the initial investment, the franchisees' only participation in the franchise was indirect, through operation of their "independent" businesses. Even if the later success of their enterprises was solely dependent upon the franchisees' own efforts, an investment contract was involved. The fact that the franchisees had floated most of the risk capital of the franchise to the franchisor, whose business was a separate venture, was conclusive. That separate venture involved a security. *CBS*, 482 P.2d 554; see also 49 Op.Att'y Gen. 124, 128–9 (Cal.1967).

Courier's financial records also reflect a substantial reliance upon sales of distributorships for its initial capitalization. These sales accounted for roughly three quarters of its capital. Homer Brand admitted in his deposition that without this source of capital, Courier could not have continued as a delivery service.

Therefore, the Master Distributorship sold to the plaintiff was a security under the Oregon securities law.

**3.** Curiously, *Mitzner v. Cardet International, Inc.*, 358 F.Supp. 1262, 1265 (Ill.1973), referred to the alternative "risk capital" test, acknowledged prevailing criticism of *Howey* and the need for a flexible approach, and resolved the problem with a liberal construction of *Howey*. *Hawaii Marketing* referred to the alternative solution of liberally construing *Howey* but then

outlined its "new" risk capital test instead. Neither case actually rejected either the test or the reasoning of the other's solution.

**4.** The first quoted phrase is from *Mitzner, supra* at 1268; the second is from *Hawaii Marketing, supra* at 109.

Accordingly, it is

ORDERED that defendants' motions for dismissal and for summary judgment on the federal securities claims are GRANTED. All motions by plaintiff and defendant for dismissal or for summary judgment regarding the Oregon securities claims are DENIED. Further proceedings are necessary to determine the liability of each defendant under the state securities claim and under the settlement agreement, and to determine damages.