Jennie M. CORDAS, d/b/a Northwest Trading Post, Plaintiff,

v.

SPECIALTY RESTAURANTS, INC., a corporation, Port of Portland, a municipal corporation of the State of Oregon, David C. Tallichet, Jr., and Port Center Village Corporation, a corporation, Defendants.

Civ. No. 76–163.

United States District Court, D. Oregon.

June 1, 1979.

Gary J. Lekas, Theodore S. Bloom, Thomas J. Barnett, Portland, Or., for plaintiff.

Jack L. Kennedy, Kennedy, King & McClurg, George J. Cooper, III, Morrison, Dunn, Cohen, Miller & Carney, Portland, Or., for Specialty Restaurants, Inc., David C. Tallichet, Jr., and Port Center Village Corp.

Donald J. Morgan, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for the Port of Portland.

## OPINION

SKOPIL, Chief Judge.

## I. INTRODUCTION

The plaintiff, Jennie Cordas, was formerly the owner of a specialty shop in the Ports O' Call Village (hereafter "Village") in Portland, Oregon. She and other tenants leased space for shops from the defendant Port Center Village Corporation ("PCVC"), which operated the Village. PCVC was a wholly owned subsidiary of the defendant Specialty Restaurants, Inc. ("Specialty"), whose president is the defendant David Tallichet. PCVC operated the Village under a lease with the defendant Port of Portland, a municipal corporation of the State of Oregon ("Port"). The complaints raise claims of misrepresentation, antitrust violations, and securities fraud.

In August 1977 the court ordered that the securities issue be segregated for separate trial. Case No. 76–163, brought by plaintiff, Jennie M. Cordas, was selected to proceed to trial first. Substantially the same questions are raised in the ten other related cases. Defendants now move for summary judgment in the Cordas case. The question is whether the sublease between the plaintiff and defendant PCVC, signed March 7, 1974, constitutes a security within the meaning of federal or state securities law, 15 U.S.C. § 77v; 15 U.S.C. § 78aa; O.R.S. Ch. 59. I grant the motion.

## II. FACTUAL SUMMARY

The operative facts, briefly summarized, are as follows.

The Port owns an industrial park on Swan Island on the Willamette River in Portland, Oregon. In the 1960s the Port conceived of a commercial, as opposed to industrial, development on the southern end of the island. This became known as the "Port Center". Port Center was conceived as a mixture of commercial facilities, all to be developed and operated by lessees. Facilities were envisioned such as a motel convention center, an office building, restaurants, a specialty shopping center, a boat dock or marina, and possibly an amusement center.

Specialty, through Mr. Tallichet, had for several years expressed interest in developing a specialty shopping center on the island. The Port and Specialty began serious negotiations in 1969. When the negotiations "jelled", Specialty organized PCVC as its wholly owned subsidiary to operate the center, which became known as the Ports O'

Call Village. The Port and PCVC signed a master lease on April 4, 1971, with Specialty guaranteeing PCVC's performance to a stated limit. The Port agreed to rough grade the leased land, provide parking space, and make certain waterfront improvements. PCVC agreed to construct and operate "first class restaurants" and retail specialty shops. Rent was based on a percentage of gross receipts. The 26-page lease contains a number of other provisions that I need not recite.

PCVC began construction following the signing of the master lease. The Port issued press releases announcing the venture to the public. The Village was not ready for occupancy until mid 1974.

With the Port's assistance, PCVC developed a brochure for distribution to potential tenants. Specialty also hired Don Haner to organize efforts to find tenants for the Village. Mr. Haner contacted the plaintiff at her shop in a specialty shopping center in Seattle. She was interested, particularly in view of the plans for the overall Port Center. She signed a sublease on March 7, 1974. The Village was not successful, and ultimately all of its tenants withdrew.

### III. EXISTENCE OF A SECURITY

The plaintiff claims that the sublease is an investment contract and a security under federal law. "Security" is defined under both the Securities Act of 1933 and the Securities Exchange Act of 1934. The 1934 Act provides:

> "The term 'security' means any note . . investment contract . . . or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . ." 15 U.S.C. § 78c(a)(10).

Though differing slightly, for practical purposes the definition contained in the 1933 Act is identical. *Tcherepnin v. Knight*, 389 U.S. 332, 335–36, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

The plaintiff contends that the sublease is a security under either the traditional formulation of *SEC v. Howey*, 328 U.S. 293, 66

S.Ct. 1100, 90 L.Ed. 1244 (1946), or under the "risk capital" test. I analyze first the *Howey* requirements.

*Howey* defined an investment contract as:

> ". . . a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed by the enterprise." 328 U.S. at 298–299, 66 S.Ct. at 1103.

The *Howey* definition thus contains three elements: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived solely from the efforts of others.

The *Howey* definition serves as the most basic framework for determining the existence of an investment contract. Yet the definition is not to be applied mechanically. The Securities Exchange Act is remedial legislation. One of its most important purposes is to protect investors through the requirement of full disclosure by issuers of securities. The courts' definition of "security" accordingly determines the scope of the Act's protections. *Tcherepnin v. Knight*, supra, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564. Because of the variable form of investments and the ingenuity of promoters, the definition of security is said to embody "a flexible rather than a static principle". *SEC v. Howey*, supra, 328 U.S. at 299, 66 S.Ct. at 1103. The courts are accordingly far more concerned with the "economic realities" of a transaction than the form of the instrument. *United Housing Foundation v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

> "[T]he reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which estab-

lished their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security" '." *SEC v. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943).

Bearing in mind these principles, I will proceed to examine this case within the elements of the *Howey* definition.

## A. SUMMARY JUDGMENT

■ The defendants' motion can be granted only if the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The defendants have the burden of demonstrating the absence of "a genuine issue as to any material fact." *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977). All doubts as to the existence of factual disputes are to be resolved against the moving party. *G. D. Searle & Co. v. Chas. Pfizer & Co.*, 231 F.2d 316, 318 (7th Cir. 1956). Once the movants have met their prima facie burden, the burden shifts to the party opposing the motion to show disputed facts. The opponent's version of the facts must support a legal theory that, if accepted, would entitle her to judgment as a matter of law. *Mutual Fund Investors v. Putnam*, supra, 553 F.2d at 624. A fact is material if it tends to resolve issues that are properly raised by the parties. Any factual issue is immaterial if it is not necessary to the decision. Wright and Miller, 10 *Federal Practice and Procedure*, § 2725 at 506–507 (1973).

## B. PRELIMINARY MATTERS

### 1. Investment of money

■ It is undisputed that under her sublease the plaintiff agreed to make rental payments, a $1,050 lease deposit, and to make improvements to the leased space to suit it for use as a retail shop. An investment of money occurs when the investor commits assets to the enterprise in such a manner as to be subjected to financial loss. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir.

1976). I hold that the plaintiff has made an investment of money within the meaning of the Securities Exchange Act. See also *El Khadem v. Equity Service Corp.*, 494 F.2d 1224 (9th Cir. 1974, cert. den. 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974).

### 2. Common enterprise

■ A common enterprise has been described as one in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973). In this circuit it is not required that there be a pooling of funds of all investors in order to satisfy the common enterprise requirement. *Brodt v. Bache & Co., Inc.*, 495 F.2d 459 (9th Cir. 1978); *Hector v. Wiens*, supra, 533 F.2d 429, 433. The commonality required is between the investor and the promoter.

The plaintiff agreed to pay to Specialty a minimum monthly rent or a percentage of plaintiff's gross receipts, whichever was greater. Sublease, Addendum II. Because percentage rents were agreed to, Specialty's rent receipts depended to some extent on the plaintiff's success. Similarly Specialty agreed to pay rent to the Port based in part on a percentage of Specialty's rental income from sublessees. Master Lease, at 4–5. Thus the Port's receipts also depended on the plaintiff's success.

There are substantial issues of fact with respect to the extent to which the plaintiff's profits depended on Specialty's efforts. This issue is discussed more fully below.

There are also substantial issues of fact with respect to the Port's responsibility in the overall enterprise. The line is unclear between the Port's role in managing the Village and Specialty's role. While the Port characterizes its role in the Village development as being limited, the promotional brochure developed by Specialty and the Port characterizes the Port's role differently. Certainly the plaintiff believed the Port's role to be more substantial than the

Port contends. Further, much of the plaintiff's complaint is concerned with the inducement of the larger "Port Center Development concept". The Port's involvement in the larger plan is therefore material to the plaintiff's cause of action.

For these reasons there are material issues of fact that would preclude summary judgment as to this issue.

## C. EFFORTS OF OTHERS

### 1. Facts

The defendants developed a brochure titled "How to Get a Piece of the Action", which is important to an understanding of the transaction. The text of the brochure, set out in full in the Appendix, describes the Village as it was then envisioned as "a totally unique fun and shopping city for Portlanders, visitors and tourists. . . . Its 6 acres of 'sheltered promenades' covering the first multi-purpose retail environment on the Portland waterfront. . . . Ports O' Call Village offers an attractive inducement to those interested in establishing an exclusive retail business—especially for crafts and goods from around the world." Included in the brochure is a description of the entire "Port Center Development concept", with "a heliport, motel, office building and apartments."

Specialty anticipated using the brochure to attract tenants to the Village. Their objective was to attract experienced merchants rather than "first venture" tenants. Tallichet depo., Vol. II at 49. The plaintiff's first contact with the venture was through a brochure left by a Specialty employee at her shop in Seattle. Cordas depo. at 36.

The plaintiff fit in with Specialty's recruiting objective. She was an experienced merchant looking for a place in Portland to open a second shop. She had operated her shop since 1965 in a Seattle specialty shopping center. Cordas depo. at 6. As she described her reaction to the brochure:

> "The whole brochure caught my fancy. I think I was ready to expand, and I was looking for an opportunity to do so." Id. at 37.

She felt that Portland "would be a nice place to retire and operate the shop." Id. She looked at other specialty shopping centers in Portland. Id. 37–39. She conducted her own informal survey of her potential competition in Portland. Id., 51. She viewed Swan Island. Id. Before signing a sublease, she discussed the venture with Specialty's promotional agents, Mr. Haner and Mr. Simmons. Id., 41–50, 59, 63–67. She and her lawyer reviewed the sublease. Id., 61. Ultimately, on March 7, 1974, she signed the sublease. Appended to the sublease are extensive rules and regulations.

The rules and regulations allowed Specialty to control many aspects of the operation of plaintiff's shop. Specialty's powers included the right to approve any change in the name of the plaintiff's business; approve any signs; control the time and place of garbage removal; control all deliveries; approve all of the plaintiff's tables, counters, cash registers, fixtures, and advertising; control the exhibition of posters and notices; prohibit the sale or display of merchandise; approve prices; require the dismissal of any employee of the plaintiff's shop who intentionally or repeatedly violated the rules or threatens the health or life of any person; establish grooming requirements; and inspect and review the plaintiff's business. In addition, the rules and regulations establish standards for the plaintiff's business, including hours of operation, quality of merchandise, demeanor, training and appearance of employees, and various other aspects of the enterprise.

Notwithstanding the rules and regulations, the plaintiff believed that under the agreement she "would be responsible for all the decisions involved in that shop. . . [including] any money decisions, merchandising decisions, management decisions, et cetera." Id., 70.

The plaintiff read through the rules and regulations appended to the sublease and found them similar to those applicable to her Seattle shop. Her "experience with the rules and regulations in Seattle had been if they were reasonable, they were enforce-

able, if they weren't reasonable, they were not enforceable." Id. at 62.

It was the plaintiff's impression that Specialty would "implement their promises, that they were to maintain the building in condition, that they were to police it properly, provide security, that they were to use good judgment in the selection of the tenants, that they were to put in this family-type restaurant, that they were to just manage it competently." Id. The plaintiff assumed that the parties' respective responsibilities were more or less the same as those under which her Seattle shop was operated. Id., 69–70.

### 2. Law

The *Howey* case required that profits be derived "solely" from the efforts of others. *SEC v. Howey*, supra, 328 U.S. at 293, 66 S.Ct. 1100. *Howey* involved a scheme in which investors bought interests in citrus groves to be managed solely by the promoters. Any efforts to be contributed by the investor would preclude coverage by the securities laws. See also *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635 (9th Cir. 1969). Recognizing that *Howey* sought to establish a flexible formula, the courts have replaced the "solely" requirement. In *SEC v. Turner*, 474 F.2d 476 (9th Cir. 1973), this circuit required that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." (474 F.2d at 482). While this formulation liberalized the *Howey* test, it cannot be understood apart from the facts that gave rise to it. In *Turner* investors essentially bought the opportunity to bring in other prospective investors. An investor was paid on the basis of the number of additional investors signed by the promoters. Once a prospect was delivered into the hands of the promoters, profits depended solely on the promoters' efforts in convincing the prospect to invest.

The *Turner* court compared the scheme before it to the situation involved in *SEC v. Howey*. The Court said that the *Turner* situation would be analogous to the *Howey* investment scheme if in *Howey* investors had been required to buy and plant citrus trees. The investor's efforts would be a necessary link in the process. Nevertheless, the essential *managerial* efforts affecting the success of the enterprise would be those of the promoters. 474 F.2d at 482–83.

Implicit in the *Turner* analysis is the assumption that the investor's efforts, though necessary, are slight. In *Hector v. Wiens*, supra, 533 F.2d 429, a farmer claimed that his only role in a triangular investment scheme involving a bank and a feedlot was to provide grain for hogs. The buying and selling of the hogs, the financing of all buying and selling, and all managerial decisions were allegedly up to the bank and the feedlot. The farmer's role, if limited to providing grain, would not preclude coverage by the securities laws. Similarly permissible efforts have been characterized as "slight" (*Lino v. City Investing*, 487 F.2d 689, 692–93 (3rd Cir. 1973)), "mechanical", or "purely ministerial". *Mitzner v. Cardet Int'l, Inc.*, 358 F.Supp. 1262 (N.D.Ill.1973).

In this analysis it is important to remember that the inquiry is not what efforts the investor contributed in fact. Rather, it is what efforts the investor was reasonably led to believe were required of her at the time she entered into the sublease. *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1228 (9th Cir. 1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 417 (8th Cir. 1974).

### 3. Terms of sublease

As a preliminary matter, the plaintiff argues that the terms of the sublease, with its extensive rules and regulations, gave the defendants control over the factors that determined the failure or success of the enterprise. She argues that it is irrelevant whether she exercised control in fact. Right to control must govern.

The rules and regulations appended to the sublease do confer extensive powers on the defendants. The defendants take the view that the rules and regulations reserve only "last resort" powers. They are de-

signed, the defendants say, to protect shop-owners from "aberrant business activities" of neighboring tenants. They are similar to the rules and regulations that governed the plaintiff's Seattle shop. The plaintiff's own understanding of the rules and regulations is consistent with the defendants' view. Cordas depo. at 62. In view of this, I reject the notion that the sublease *ipso facto* makes the plaintiff's efforts in the common enterprise nominal.

The plaintiff's argument is based on an interpretation of *Mr. Steak, Inc. v. River City Steak, Inc.*, 324 F.Supp. 640, 644 (D.Colo.1970), that I reject. In that case the court examined a franchise agreement that allocated extensive control to the franchisor and only some control to the franchisee. The franchisee argued that in fact he had not exercised the control reserved to him under the agreement. The court held that who exercised actual control was not decisive. Rather, it was but one factor to consider. The "more critical factor [was] the nature of the investor's participation in the enterprise." 324 F.Supp. at 645. The court's holding is merely a reflection of the principle that no single factor is decisive in determining the existence of an investment contract. The court must examine the entire transaction in the light of "economic reality".

Further, as I have mentioned previously, actual control and legal right to control are relevant only insofar as they shed light on what the investor reasonably believed was required of her at the time she entered into the sublease. *Miller v. Central Chinchilla Group*, supra, 494 F.2d at 417. As to this, we may accept the plaintiff's own words. It is clear that at the time the sublease was signed she understood that she was to retain managerial control over her shop.

### 4. *Significant efforts*

The plaintiff next contends that economic realities made insignificant any control she had over her own shop:

"The success or failure of plaintiff, and other similarly situated, depended to a large degree upon the ability of the Village macrosystem to generate traffic and, therefore, depended upon the efforts of defendants as the developer/manager of the macrosystem. Defendants were not successful in these efforts, and, hence, the opportunity for plaintiff to succeed was nil." (Plaintiff's Memorandum in Opposition at 31–32.)

The plaintiff contends that the crucial element in the Village's success was its ability to attract shoppers. Her position is that the defendants controlled all the significant variables in this respect, including: location of the Village within its trading area; providing adequate "draw" merchants; determining proper "tenant mix"; locating tenants within the Village; effective promotion and advertising; determining hours and days of operation; and others.

She claims that she occupied much the same position as does the manager of one department in a department store. She managed the day-to-day operations of her department, but she could not profit unless the store succeeded in attracting shoppers. If the store as a whole is badly managed, the best efforts of a single department manager will be futile.

The plaintiff would establish this view through the testimony of two experts, Mr. Grubb and Mr. Finn. A trier of fact might or might not accept their opinions. Plainly the defendants do not concede the truth of their testimony. This raises a question of fact that, if material, must preclude summary judgment. The question is whether this view of economic reality is material. In order to determine this question, I will accept as a premise the plaintiff's view and proceed to evaluate the plaintiff's case in that light. Before doing so, however, it is important to place the plaintiff's theory in context.

While Mr. Grubb believed that the plaintiff could not succeed if the center failed, he acknowledged that various efforts of individual shopowners were "important to the total operation and to, therefore, the profitability." Grubb depo. at 54. It would be possible within a successful shopping center to have some shops fail because of

bad management by individual shopowners. Id. at 22, 55, 81. Whether or not the plaintiff and the defendants were precisely "equal partners" (see Id. at 79–80, 87), Mr. Grubb agreed that they shared control over the enterprise. Individual shopowners had responsibility for some of the "essential managerial decisions". Id. at 79.

The specific question I must decide is, assuming the plaintiff can establish that (1) she could not profit unless the Village as a whole was successful, and (2) her role in the Village's success was nominal, and recognizing that plaintiff's role in her own shop was entrepreneurial and managerial, can she claim the protection of the securities laws? Implicit is the question whether the *Howey* definition, as modified by *SEC v. Turner* and other cases, is concerned with the investor's impact on an enterprise or merely with the quality of the investor's participation. If the investor's impact is key, an investor may be protected even though his efforts are in some sense "entrepreneurial or managerial" as long as his impact on the enterprise is nominal. If quality of participation is the crucial factor, an investor would not be protected as long as his efforts can reasonably be characterized as entrepreneurial or managerial.

■■■ I hold that the plaintiff has not brought herself within the reach of the *Howey* definition. This case is in one sense the mirror image of *SEC v. Turner*, supra, 474 F.2d 476. In *Turner* the investor took the nominal role of delivering prospects into the hands of the promoters, who generated a profit. In this case the promoters are to deliver shoppers into the investor's hands. To make a profit the investor must generate sales. The role played by the investors in *Turner* and in *Hector v. Wiens*, supra, 533 F.2d 429 is thus qualitatively different from the role played here.

It is undeniable here that the plaintiff's managerial efforts were intended to have an important effect on her own success. Her efforts would also have some effect, however slight, on the success of the enterprise as a whole. Grubb depo. at 21–22, 86. These factors are sufficient to preclude her from coverage under the *Howey* analysis.

It is significant indeed that under the plaintiff's view of the evidence, she cannot profit unless the Village succeeds. See *Bitter v. Hoby's International, Inc.*, 498 F.2d 183 (9th Cir. 1974); *Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635 (9th Cir. 1969); *Stanley v. Commercial Courier*, 411 F.Supp. 818 (D.Or.1975). This factor is an indication of the extent of the plaintiff's reliance on the defendants' efforts. As reliance approaches being absolute, the sublease takes on more of the appearances of a security. *Schultz v. Dain Corp.*, 568 F.2d 612 (8th Cir. 1975). However, this single factor is not decisive where, as here, some of the essential managerial decisions bearing on success are in the investor's hands.

To hold otherwise would put the courts in the position of judging where along the continuum a manager's efforts become "significant" in the success of a larger enterprise. The owner-manager of a small shop might have "invested" in a shopping center within the meaning of the securities laws, while the owner of a department store had not. There may be merit to the idea that smaller merchants require protection that larger enterprises do not. However, I cannot read the federal securities laws as now written as providing a basis for such distinctions.

This transaction bears few of the earmarks of a solicitation of capital for profit-making purposes. The offer was to retailers, not to the general public. There was no representation that investors could rely absolutely on the defendants to turn a profit. It was, and the plaintiff understood it to be, a joint effort in which her managerial expertise would be essential. Her role in the venture was to be far from the simple efforts required of the investors in *SEC v. Turner*, supra, and *Hector v. Wiens*, supra.

## D. RISK–CAPITAL ANALYSIS

■■■ I must also examine the plaintiff's contention that she gambled her capital in a poorly financed speculative enterprise and so comes under the "risk capital" test of an

investment contract. See, e. g., *Silver Hills Country Club v. Sobieski,* 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961). This analysis has been applied by federal courts to instances where:

> "the investor, even if he can participate in or control some phase of the enterprise, is gambling 'risk capital', where there is less than an even chance of success, against the opportunity for large profits. Because of the substantial risk of loss, to include such operations within the purview of the 1933 Act would fulfill the purpose of protecting passive investors by compelling disclosure of the disquieting aspects of a scheme." *Mr. Steak, Inc. v. River City Steak, Inc.,* 324 F.Supp. 640, 646 (D.Colo.1970).

In this circuit the "risk capital" analysis has been confined primarily to loans used to capitalize an investor's business where the lender risks loss. *United California Bank v. THC Financial Corp.,* 557 F.2d 1351 (9th Cir. 1977); *AMFAC Mtg. Corp. v. Arizona Mall of Tempe,* 583 F.2d 426 (9th Cir. 1978); *Great Western Bank v. Kotz,* 532 F.2d 1252 (9th Cir. 1976); *El Khadem v. Equity Securities Corp.,* 494 F.2d 1224 (9th Cir. 1974). Compare *Mr. Steak, Inc. v. River City Steak, Inc.,* supra, 324 F.Supp. 640.

In Oregon the "risk capital" analysis has broader currency. See *State ex rel Healy v. Consumer Business System, Inc.* (hereafter "CBS"), 5 Or.App. 19, 482 P.2d 549 (1971); *Stanley v. Commercial Courier Service,* 411 F.Supp. 818 (D.Or.1975). In *CBS,* supra, the Oregon Court of Appeals held that a franchise was a security under Oregon law where the franchisor "was dependent upon the franchisees for a substantial portion of its initial capital." 482 P.2d at 555. There the evidence showed that the franchisor's primary source of capital was from franchise fees. This may be a somewhat broader formulation than has been approved by federal courts. See, e. g., *Mr. Steak, Inc. v. River City Steak, Inc.,* supra, 324 F.Supp. 640, 647. ("[T]he better view would limit the 1933 Act to situations where exception-

ally high risk, speculative franchises are involved.")

In this case it is uncontroverted that Specialty was a going concern well before the plaintiff invested her assets. Specialty owned and operated a specialty shopping center in California and several restaurants in other states. When negotiations "jelled" between Specialty and the Port in 1970, Specialty organized PCVC as the proposed operator of the Village. The organizational arrangements followed in most respects the approach taken in Specialty's other ventures. PCVC was a wholly owned subsidiary of Specialty and was capitalized with $1,000.* Specialty's subsidiaries generally have three directors, who are Specialty employees. Specialty's president generally serves as president of the subsidiary. Specialty typically guarantees the subsidiary's financial obligations up to a certain limit and its lease obligations for a period of years. Tallichet depo., Vol. I, p. 10.

This pattern was followed generally here. PCVC obtained a $1.2 million mortgage loan from a bank, with Specialty's guarantee. Specialty made a no-interest loan to PCVC to meet capital requirements. Tallichet depo., Vol. I at 19–20. For a short time after the master lease was signed, PCVC made loan payments to the bank. Specialty then loaned funds to PCVC to enable it to meet this obligation. Specialty also made no-interest loans to PCVC to cover operating losses and cost over-runs during the project's construction phase. Tallichet depo., Vol. I at 20–21, 29–30.

The plaintiff argues that it is PCVC's capitalization with which we must be concerned rather than Specialty's. She contends that PCVC was inadequately capitalized to begin with and thus depended on tenants' improvements and rental payments in order to operate. This in turn created an "extremely high risk" that the plaintiff's investment would be lost. Thus, the plaintiff contends, PCVC was completely dependent upon operating revenues for survival.

---

* Mr. Tallichet stated that it was usual for Specialty to pay in $25,000 as initial capital. He did not know why $1,000 was paid in this case. Tallichet depo., Vol. I, p. 9.

Start-up costs for the operation were to be borne by the defendants, the plaintiff, and other tenants. The construction costs of $1,725,000 were to be borne by Specialty. The Port was to make various site improvements with an expenditure of $225,000. Tenants' improvements were valued prospectively at $525,000. The plaintiff's share of these costs does not appear. The tenants' improvements in the aggregate amount to slightly more than one-fourth of the start-up costs.

As the defendants originally conceived the operation, operating revenues were to come exclusively from gross sales of tenants. However, Mr. Tallichet's deposition testimony is uncontroverted that Specialty itself made loans to cover operating deficits when revenues were less than anticipated. Tallichet depo. at 17. The record does not reflect the extent of such loans. In any event, in light of the nature and extent of the defendants' backing, it would be unrealistic to view PCVC's capitalization in isolation from the other defendants. Accordingly, the tenants' aggregate investment in improvements cannot be said to constitute the Village's primary source of capital.

Specialty was a reasonably well-established and adequately capitalized concern at the time of the investment. The bank loan that financed construction of the Village was backed by Specialty's guarantee. The Village itself was near completion at the time of the investment transaction. Lease deposits and rental payments were to provide operating revenues rather than initial capitalization.

The fact that tenants were to finish the space for their shops is not unusual, as the plaintiff agreed in her deposition. This practice is not uncommon in such a venture and serves a reasonable business purpose. It enables each shopowner to create a particular ambience for his or her shop. Further, the physical plan of a shop can have a significant bearing on the shop's revenue. Grubb depo. at 16–18. These are judgments typically made by the owner of a retail shop. In view of this, the tenants' investment in improvements, while conced-

edly an investment of capital, is not the primary source of capital envisioned by the risk-capital analysis.

 Thus under either federal or state law there was no investment of risk-capital sufficient to create a security.

For the foregoing reasons,

IT IS ORDERED that the defendants' motions for summary judgment are granted.