**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**GLENN W. TURNER ENTERPRISES, INC., et al., Defendants-Appellants.**

**No. 72–2544.**

United States Court of Appeals,
Ninth Circuit.

Feb. 1, 1973.

See also, D.C., 355 F.Supp. 1402.

Jeffrey A. Tew (argued), Miami, Fla., Charles R. Mowry, of Dardano, Mowry & Hanson, Portland, Or., Clarke C. Brown, Salem, Or., Theodore I. Koskoff, Bridgeport, Conn., Bruce Jarman, Salem, Or., John A. Burgess, Montpelier, Vt., for defendants-appellants.

David Ferber, Solicitor (argued), James E. Newton, Jack H. Bookey, Francis N. Mithoug, Jerry King, Attys., Richard E. Nathan, Asst. Gen. Counsel, Securities and Exchange Comm., Washington, D. C., for plaintiff-appellee.

Before DUNIWAY, HUFSTEDLER, and TRASK, Circuit Judges.

DUNIWAY, Circuit Judge:

This is an appeal from an order, 348 F.Supp. 766, granting the Securities and Exchange Commission a preliminary injunction. The injunction prohibits offering and selling by appellants of certain of their "Adventures" and "Plans", and also any withdrawal by appellants of funds from the assets of the corporate defendants other than in the regular course of business. Dare To Be Great, Inc. (Dare), a Florida corporation, is a wholly owned subsidiary of Glenn W. Turner Enterprises, Inc. The individual defendants are, or were, officers, direc-

tors, or employees of the defendant corporations.[1]

The trial court's findings, which are fully supported by the record, demonstrate that defendants' scheme is a gigantic and successful fraud. The question presented is whether the "Adventures" or "Plan" enjoined are "securities" within the meaning of the federal securities laws. Of the five that Dare offers—Adventures I, II, III, and IV, and the $1,000 Plan—the court held that Adventures III and IV and the $1,000 Plan are securities. We affirm.

### I. *The Adventures and the $1000 Plan—the facade.*

The five courses offered by Dare ostensibly involve two elements. In return for his money, the purchaser is privileged to attend seminar sessions and receives tapes, records, and other material, all aimed at improving self-motivation and sales ability. He also receives, if he purchases either Adventure III or IV or the $1,000 Plan, the opportunity to help to sell the courses to others; if successful he receives part of the purchase price as his commission. There is no doubt that this latter aspect of the purchase is in all respects the significant one.

Adventure I costs $300. The purchaser receives one portable tape recorder, twelve tape recorded lessons, and certain written material in notebooks. He is entitled to attend a 12–16 hour group session.

Adventure II includes Adventure I, and costs $700. The purchaser receives twelve more tape recorded lessons. He is offered approximately 80 hours of group sessions.

Adventure III includes Adventures I and II, and costs $2,000. The purchaser receives six more tape recordings, one notebook of written material called "The Fun of Selling," and a limited amount of written instructions and material, as well as thirty more hours of group sessions. The purchaser also receives a different sort of benefit. After fulfilling a few nominal requirements he becomes an "independent sales trainee," empowered to sell the Adventures. He receives $100 for each Adventure I, $300 for each Adventure II, and $900 for each Adventure III that he sells.

Adventure IV costs $5,000, and includes Adventures I, II and III. The purchaser receives six more tapes, the opportunity for thirty more hours of group sessions, the opportunity to attend two other week-long courses in Florida, at his own expense, and he may or may not receive a movie projector with six cartridge-type films. He also is now empowered to sell all of the Adventures to others. For selling Adventure IV he gets $2,500.

Finally, there is the $1,000 Plan. For this sum the purchaser receives the tape cassettes sold in Adventure II, but not the accompanying written material. He also receives some additional sales instruction, and may be entitled to a 24-hour group session. He may also sell the Plan, if he brings two individuals to the person who sold him the Plan, and if these two also purchase the Plan from the first seller. If that occurs, he may then sell the Plan on his own, receiving $400 for each additional sale that he makes. If one brings three people into the scheme, he may sell the $1,000 Plan without buying it himself, and would earn the same $400 commission for each additional sale that he makes.

### II. *The Adventures and the Plan in operation.*

It is apparent from the record that what is sold is not of the usual "business motivation" type of courses. Rather, the purchaser is really buying the possibility of deriving money from the sale of the plans by Dare to individuals whom the purchaser has brought to Dare. The promotional aspects of the plan, such as seminars, films, and records, are aimed at interesting others

---

1. The district court found that defendant Sant had not been linked to these proceedings.

in the Plans. Their value for any other purpose, is, to put it mildly, minimal.

Once an individual has purchased a Plan, he turns his efforts toward bringing others into the organization, for which he will receive a part of what they pay. His task is to bring prospective purchasers to "Adventure Meetings."

### A. *The meetings.*

These meetings are like an old time revival meeting, but directed toward the joys of making easy money rather than salvation. Their purpose is to convince prospective purchasers, or "prospects," that Dare is a sure route to great riches. At the meetings are employees, officers, and speakers from Dare, as well as purchasers (now "salesmen") and their prospects. The Dare people, not the purchaser-"salesmen", run the meetings and do the selling. They exude great enthusiasm, cheering and chanting; there is exuberant handshaking, standing on chairs, shouting, and "money-humming".[2] The Dare people dress in expensive, modern clothes; they display large sums of cash, flaunting it to those present, and even at times throwing it about; they drive new and expensive automobiles, which are conspicuously parked in large numbers outside the meeting place. Dare speakers describe, usually in a frenzied manner, the wealth that awaits the prospects if they will purchase one of the plans. Films are shown, usually involving the "rags-to-riches" story of Dare founder Glenn W. Turner. The goal of all of this is to persuade the prospect to purchase a plan, especially Adventure IV, so that he may become a "salesman", and thus grow wealthy as part of the Dare organization. It is intimated that as Glenn W. Turner Enterprises, Inc. expands, high positions in the organization, as well as lucrative opportunities to purchase stock, will be available. After the meeting, pressure is applied to the prospect by Dare people, in an effort to induce him to purchase one of the Adventures or the plan. The sale is sometimes closed by the purchaser who brought the prospect to the meeting, but primarily, by Dare salesmen, specialists in the "hard sell."[3]

The format of the meeting is preordained. A script created by Dare is strictly adhered to. The format applies even to the sale, there being a standard procedure for inducing the prospect to sign his name to the agreement and to part with his money. While no express guarantee of success is made at the meetings, and the statement is made that the purchaser must expect to work, the impression which is fostered is of the near inevitability of success to be achieved by anyone who purchases a plan and follows Dare's instructions.

Dare also arranges, in addition to the Adventure Meetings, "GO Tours," or "Golden Opportunity Tours." Prospects are taken by plane or bus to one of Dare's regional centers where further meetings and sales efforts are undertaken. A significant effort is made during the trip itself to sell the plans to prospects. Much the same atmosphere as at the meetings pervades the trip—exuberant shouting, chanting, handshaking, relating of success stories, and lavish displays of cash.

In a scheme such as this, the possibility that a market will become "saturated" is a real one. Saturation has in fact occurred in some markets, but this is not mentioned at the meetings. Few, if any, purchasers of these plans have achieved any success remotely approach-

---

2. Although mention of "money-humming" is made at several points in the record, we are not certain what this activity entails, nor do we venture to guess.

3. On at least some occasions prospects are told to acquire the necessary money through bank loans, by not being candid about the purpose of the loan, and by making simultaneous applications to a number of banks without informing each bank that more than one application is being made.

ing that described by defendants and their agents.

## B. *The role of the purchaser-salesman.*

Once he has bought a plan that empowers him to help sell the plans to others, the task of the purchaser is to find prospects and induce them to attend Adventure Meetings. He is not to tell them that Dare To Be Great, Inc. is involved. Rather, he catches their interest by intimating that the result of attendance will be significant wealth for the prospect. It is at the meetings that the sales effort takes place. The "salesman" is also told that to maximize his chances of success he should impart an aura of affluence, whether spurious or not—to pretend that through his association with Dare he has obtained wealth of no small proportions. The training that he has received at Dare is aimed at educating him on this point. He is told to "fake it 'til you make it," or to give the impression of wealth even if it has not been attained. He is urged to go into debt if necessary to purchase a new and expensive automobile and flashy clothes, and to carry with him large sums of money, borrowing if necessary, so that it can be ostentatiously displayed. The purpose of all this is to put the prospect in a more receptive state of mind with respect to the inducements that he will be subject to at the meetings.

## III. *The Adventures and Plans as Securities.*

The district court held that Adventures III and IV, and the $1,000 Plan were securities under the Securities Act of 1933, 15 U.S.C. § 77a et seq. and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. The definitions of security that are found in each Act are almost identical.[4] Both definitions include the terms "investment contract," "certificate of interest or participation in any profit-sharing agreement," and any "instrument commonly known as a 'security'." The district court held that the plans in question fell into all three categories of securities. Because we find them to be investment contracts, we need not decide whether the other definitions are applicable as well.

The 1933 and 1934 Acts are remedial legislation, among the central purposes of which is full and fair disclosure relative to the issuance of securities, SEC v. W. J. Howey Co., 1945, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244; Tcherepnin v. Knight, 1967, 389 U.S. 322, 337, 88 S.Ct. 548, 19 L.Ed.2d 564. It is a familiar canon of legislative construction that remedial legislation should be construed broadly, Tcherepnin

---

4. The Securities Act of 1933 defines "security" as:

". . . any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77b(1).

The Securities Exchange Act of 1934 defines "security" as:

". . . any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to any purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited." 15 U.S.C. § 78c(a)(10).

v. Knight, *supra*, 389 U.S. at 337, 88 S. Ct. 548. The Acts were designed to protect the American public from speculative or fraudulent schemes of promoters.[5] For that reason Congress defined the term "security" broadly, and the Supreme Court in turn has construed the definition liberally. In SEC v. Joiner Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88, the Court stated: "However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security"'." 320 U.S., *Id.* at 351, 64 S.Ct. at 123. In SEC v. W. J. Howey Co., *supra*, the Court stated that the definition of a security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[6] 328 U.S. *Id.* at 299, 66 S.Ct. at 1103. And in the recent case of Tcherepnin v. Knight, *supra*, the Court stated, "[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 336, 88 S.Ct. at 553. We approach the definition of a "security" with these admonitions in mind.

In SEC v. W. J. Howey Co., *supra*, the Supreme Court set out its by now familiar definition of an investment contract:

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104.

In *Howey* the Court held that a land sales contract for units of a citrus grove, together with a service contract for cultivating and marketing the crops, was an investment contract and hence a security. The Court held that what was in essence being offered was "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." *Id.* at 299, 66 S.Ct. at 1103. The purchasers had no intention themselves of either occupying the land or developing it; they were attracted only "by the prospects of a return on their investment." *Id.* at 300, 66 S.Ct. at 1103. It was clear that the profits were to come "solely" from the efforts of others.

For purposes of the present case, the sticking point in the *Howey* definition is the word "solely," a qualification which of course exactly fitted the circumstances in *Howey*. All the other elements of the *Howey* test have been met here. There is an investment of money,

---

5. The broad purpose of the Securities Act of 1933 was stated in the report of the Senate Committee on Banking and Currency, S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933):

"The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; . . . ."

6. A sample listing of cases in which diverse schemes have been held to involve securities includes: Continental Marketing Corp. v. SEC, 10 Cir., 1967, 387 F.2d 466, cert. denied, 1968, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (beavers); Roe v. United States, 5 Cir., 1961, 287 F.2d 435, cert. denied, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29 (mineral leases); Los Angeles Trust Deed & Mortgage Exch. v. SEC, 9 Cir., 1961, 285 F.2d 162, cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241 (mortgages and deeds of trust); Penfield Co. of California v. SEC, 9 Cir., 1944, 143 F.2d 746, cert. denied, 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (whiskey sales contracts); SEC v. Crude Oil Corp. of America, 7 Cir., 1937, 93 F.2d 844 (crude oil sales contracts).

a common enterprise,[7] and the expectation of profits to come from the efforts of others. Here, however, the investor, or purchaser, must himself exert some efforts if he is to realize a return on his initial cash outlay. He must find prospects and persuade them to attend Dare Adventure Meetings, and at least some of them must then purchase a plan if he is to realize that return. Thus it can be said that the returns or profits are not coming "solely" from the efforts of others.

■ We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word "solely" should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities. Within this context, we hold that Adventures III and IV, and the $1,000 Plan, are investment contracts within the meaning of the 1933 and 1934 Acts.[8]

Strict interpretation of the requirement that profits to be earned must come "solely" from the efforts of others has been subject to criticism. *See, e. g.,* State of Hawaii v. Hawaii Market Center, Haw.1971, 485 P.2d 105. Adherence to such an interpretation could result in a mechanical, unduly restrictive view of what is and what is not an investment contract.[9] It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. Thus the fact that the investors here were required to exert some efforts if a return were to be achieved should not automatically preclude a finding that the Plan or Adventure is an investment contract. To do so would not serve the purpose of the legislation. Rather we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

In this case, Dare's source of income is from selling the Adventures and the Plan. The purchaser is sold the idea that he will get a fixed part of the proceeds of the sales. In essence, to get that share, he invests three things: his money, his efforts to find prospects and bring them to the meetings, and whatever it costs him to create an illusion of his own affluence. He invests them in Dare's get-rich-quick scheme. What he buys is a share in the proceeds of the selling efforts of Dare. Those efforts are the *sine qua non* of the scheme; those efforts are what keeps it going; those efforts are what produces the money which is to make him rich. In essence, it is the right to share in the proceeds of those efforts that he buys. In our view, the scheme is no less an investment contract merely because he contributes some effort as well as money to get into it.

Let us assume that in *Howey, supra,* the sales and service agreements had provided that the buyer was to buy and plant the citrus trees. Unless he did so, there would be no crop to cultivate, har-

---

7.   A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties. *See, e. g.,* Los Angeles Trust Deed & Mortgage Exch. v. SEC, 9 Cir., 1961, 285 F.2d 162, 172, cert. denied, 366 U.S. 919, 81 S.Ct. 1095, 6 L.Ed.2d 241.

8.   We note that under the laws of three states defendants' promotions have been held to be securities: Hurst v. Dare To Be Great, Inc., D.Ore. (Civ.No. 71–160, Jan. 12, 1972) ; State of Idaho v. Glenn Turner Enterprises, Inc., Dist.Ct. 4th Jud. Dist.Ida. (Civ. No. 47773, March 28, 1972) ; Frye v. Taylor, Dist. Ct. of Appeal, 4th Dist. Fla., 1972, 263 So.2d 835.

9.   *See, e. g.,* Georgia Market Centers, Inc. v. Fortson, 1969, 225 Ga. 854, 171 S.E. 2d 620; Gallion v. Alabama Market Centers, Inc., 1968, 282 Ala. 679, 213 So. 2d 841. *Compare* State of Hawaii v. Hawaii Market Center, 1971, 485 P.2d 105.

vest and sell, no moneys in which he could share. The essential nature of the scheme, however, would be the same. He would still be buying, in exchange for money, trees and planting, a share in what he hoped would be the company's success in cultivating the trees and harvesting and marketing the crop. We cannot believe that the Court would not have held such a scheme to be an investment contract. So here. Regardless of the fact that the purchaser here must contribute something besides his money, the essential managerial efforts which affect the failure or success of the enterprise are those of Dare, not his own.

Our holding in this case represents no major attempt to redefine the essential nature of a security.[10] Nor does our holding represent any real departure from the Supreme Court's definition of an investment contract as set out in *Howey*. We hold only that the requirement that profits come "solely" from the efforts of others would, in circumstances such as these, lead to unrealistic results if applied dogmatically, and that a more flexible approach is appropriate.

Affirmed.

---

10. *See Coffey*, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 W.Res.L.Rev. 367 (1967) wherein Professor Coffey proposes new guidelines for determining the existence of a security.