**INFOREX CORPORATION, N.V., Plaintiff,**

v.

**MGM/UA ENTERTAINMENT COMPANY, et al., Defendants.**

**No. CV 84–4584 KN (Kx).**

United States District Court, C.D. California.

Dec. 28, 1984.

Stanton L. Stein, Stein & Kahan, Marcia J. Harris, Steven J. Rossenwasser, Santa Monica, Cal., for plaintiff.

Howard King, Gang, Tyre & Brown, Inc., Los Angeles, Cal., for defendant Albert R. Broccoli.

Christine A. Snyder, Wyman, Bautzer, Rothman, Kuchel & Silbert, Los Angeles, Cal., for defendants MGM/UA Entertainment Co., United Artists Corp., and ALGEMENEFINANCIERINGSMATTSCHAPPIG NEFICO D.V.

## ORDER

KENYON, District Judge.

The Court heard argument from counsel on November 21, 1984 with respect to defendants' Motion to Dismiss, and having considered the papers filed thereon, IT IS HEREBY ORDERED:

Defendants' motion to dismiss the federal securities laws claims alleged in counts ten and eleven of the Complaint is granted. Consequently, the Court dismisses the pendent state claims alleged in counts one, two, and eight through seventeen, since no other basis of jurisdiction remains for these claims. The Court denies the motion to dismiss counts three through seven for failure to join indispensable parties. Further, the Court denies defendants' motion to dismiss counts three through seven on statute of limitations grounds. Finally, plaintiff has stated the essential elements of a tort claim for breach of the implied covenant of good faith and fair dealing, and the motion to dismiss the sixth cause of action on this ground is denied.

## I. Federal Securities Laws Claims

■ Plaintiff Inforex currently provides, and is the assignee of predecessor Loan-out Companies that have provided, the acting services of Sean Connery. In particular, the securities laws claims concern the compensation packages executed between Connery or his representatives and defendants in connection with several James Bond films. In each of the agreements, Connery or his assignee received, *inter alia*, a percentage of profits derived from the film. For example, in the Principal Agreement and First Supplemental Agreement, Connery's assignee was to receive a guaranteed sum plus an amount equal to "one percent (1%) of all gross monies in excess of Four Million Dollars ($4,000,000) received by distributors with respect to the distribution and exploitation of any motion picture in the United States with respect to which Connery's services are rendered." Complaint ¶ 18. These percentage-of-the-profits clauses are central to the federal securities laws claims that defendants seek to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Count ten of the complaint alleges a violation of § 10(b) of the Securities Exchange Act of 1934. Count eleven alleges a violation of § 17(a) of the Securities Act of 1933. Defendants seek to dismiss these counts on the grounds that the percentage-of-the-profits clauses do not constitute a "security" within the meaning of these Acts. In deciding this issue, this Court must be mindful of the general purpose underlying the federal securities laws.

> The primary purpose of the Securities Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.

*United Housing Foundation v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). In furtherance of this purpose, a considerable body of law has developed concerning the appropriate definition of a security. The statutory definitions are provided in 15 U.S.C. § 77b(1) (1933 Act) and 15 U.S.C. § 78c(a)(10) (1934 Act). Although the definitions of a "security" in the two Acts slightly differ, the two definitions have been held to be virtually identical. *Tcherepnin v. Knight,* 389 U.S. 332, 335–36, 88 S.Ct. 548, 552–53, 19 L.Ed.2d 564 (1967). The legal issue presented turns upon a determination of whether the facts alleged in the complaint, taken as true for purposes of a 12(b)(6) motion, constitute a security within the statutory definition. Although the security definition question often rests upon a factual inquiry necessitating a summary judgment determination, "if the transactions pleaded do not constitute 'securities,' then dismissal for failure to state a claim upon which relief can be granted is proper." *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.,* 583 F.2d 426, 430 (9th Cir. 1978).

■ The seminal decision regarding the definition of a security under the federal securities laws is *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In that case, the Court found the investment scheme constituted an "investment contract" within the statutory defini-

tion because the scheme "involve[d] [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." Id. at 301, 66 S.Ct. at 1104. Although *Howey* limited this three-prong test to the subset of securities constituting "investment contracts," the Supreme Court later found that this three-prong test "embodies the essential attributes that run through all of the Court's decisions defining a security." *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060. The Ninth Circuit utilizes a "risk capital" test that inquires whether the investor "contributed 'risk capital' subject to the 'entrepreneurial efforts' of [others]." *United California Bank v. THC Financial Corp.*, 557 F.2d 1351, 1358 (9th Cir.1977). But this Ninth Circuit approach merely encompasses the *Howey* test. *Amfac*, 583 F.2d at 432. Thus, in analyzing the facts alleged in the present complaint, this Court focuses upon whether plaintiff has stated the three elements necessary to satisfy the *Howey* test. In so doing, the Court is cognizant of the breadth and yet the necessary limitations which the Supreme Court has placed on the "security" definition. On the one hand, the Court has noted that the definition "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103. On the other hand, the Supreme Court has more recently recognized that "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). Based upon such guidance from the Supreme Court and case law interpreting the *Howey* test, this Court finds that plaintiff has not alleged facts that satisfy the third element of the *Howey* test. This alone is sufficient to grant the motion to dismiss the federal securities laws claims. The Court, therefore, does not address the first two elements of the test.

The third prong of the *Howey* test speaks in terms of "profits to come *solely* from the efforts of others." *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104 (emphasis added). The Ninth Circuit has found, however, that a slavish application of the word "solely" would lead to results contrary to the purposes underlying the securities laws. In *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973), the court confronted a dubious sales and distribution scheme in which the principal activity of the investor was finding other investors. After noting the broad public protection that Congress intended to afford through the federal securities laws, the Ninth Circuit states: "[T]he word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." *Id.* at 482. The court feared that the securities laws could be evaded simply by requiring the investor to contribute a "modicum of effort." *Id.* Instead, the Ninth Circuit developed "a more realistic test," *id.*, which focused upon "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* In the scheme presented to the *Turner* court, the efforts of the promoters were found to be "the *sine qua non* of the scheme." *Id.* After comparing that scheme to a hypothetical modification of the scheme presented in *Howey*, the Ninth Circuit found: "Regardless of the fact that the purchaser here must contribute something besides his money, the essential managerial efforts which affect the failure or success of the enterprise are those of [the promoter], not [the investor]." Id. at 483.

Plaintiff places great reliance on *Turner*, arguing that Connery was in a position similar to the purchaser in *Turner* and that defendants made the "undeniably significant" managerial efforts to ensure the success of the film ventures. It is difficult to find, however, that the "modicum of ef-

fort" put forth by the investor in *Turner* is analogous to the effort put forth by Sean Connery as lead actor in several James Bond films. This *Turner* modification to *Howey* which allows a nominal effort by the investor to still constitute a security was reemphasized by the Ninth Circuit in *Smith v. Gross*, 604 F.2d 639 (1979). In that case, plaintiffs "alleged that they were promised that the effort necessary to raise worms was *minimal* and they alleged that they could not receive the promised income unless the defendants purchased their harvest." Id. at 643 (emphasis added). Once again, it is difficult to analogize the effort required of Sean Connery to the minimum efforts alleged to be required by the plaintiffs in *Smith*.

Plaintiff, while conceding that the complaint alleges that Sean Connery played the role of James Bond in the particular James Bond films at issue here, nevertheless attempts to distinguish this significant acting effort from the managerial efforts emphasized by *Howey* and its progeny. In essence, plaintiff asserts that Connery contributed no effort that is relevant for securities purposes, but instead obtained a "reasonable expectation of profits to be derived from the *entrepreneurial* or *managerial* efforts of other." *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060 (emphasis added). This Court finds no authority for distinguishing Connery's efforts from the entrepreneurial or managerial efforts at issue in prior cases. It is true that earlier cases have described the efforts necessary to take the investment out of the "security" category as being either entrepreneurial or managerial. But none of these cases do so for the purpose of distinguishing such entrepreneurial or managerial efforts from other efforts that are also undeniably significant to the success or failure of the venture. Such a distinction was not necessitated in those cases. In this case, alleging that Sean Connery agreed to play and did play James Bond in the relevant films establishes that he had an undeniably significant role in the venture, not only in its artistic success, but also in its commercial success. Plaintiff has set forth no argu-

ment, and this court has found none, that would require that the effort must be managerial in nature, unless "managerial" is broadly defined to include any active participation directed toward securing the profitability of the venture. In the context of this case, this Court agrees with the analysis set forth by the California Supreme Court in *People v. Syde*, 37 Cal.2d 765, 235 P.2d 601 (1951). Although *Syde* predates *Turner* and involves California securities laws, the extent of the effort put forth by Sean Connery in James Bond films makes *Syde* pertinent to the case at bar.

> The artist invested in returns from his ... actual participation in the production of a film if profits were realized from the sale thereof. It was not contemplated that he was to play the passive role of an investor only. True the direction in the production and the marketing of the film lay exclusively in the management of the defendants. But the film from which the artist was to profit could not be produced without his actual participation as a member of the case.

37 Cal.2d at 769, 235 P.2d 601. This Court need not and does not find that all actors with percentage-of-the-profits clauses in their employment contracts would fall outside the purview of the federal securities laws. The Court is simply stating that performing the role of James Bond in James Bond films is an effort that is as undeniably significant to the films' success or failure as the production, distribution, or marketing of the films. As such, the percentage-of-the-profits clauses at issue in this case fail to satisfy the third prong of the *Howey* test and must fall outside of the statutory definition of a security. The tenth and eleventh counts of the Complaint, therefore, are dismissed.

Since the tenth and eleventh counts provided the only basis for federal question jurisdiction, the Court will dismiss all counts in the Complaint which are based solely upon pendent jurisdiction. Therefore, counts one, two, and eight through seventeen are dismissed for lack of jurisdic-

tion since no federal claim remains to which they could be pendent.

## II. *Foreign Defendants As Indispensable Parties*

■ Under the guidelines provided by Rule 19 of the Federal Rules of Civil Procedure, this Court finds that the foreign defendants need not be joined with respect to the five counts remaining against defendants MGM/UA and UA. Hence, counts three through seven are within this Court's diversity of citizenship jurisdiction.

Counts three through seven are based upon the Letter Agreement, see ¶ 25 of the Complaint, and several implied contractual obligations. Each of these contractual rights was executed between plaintiff or its assignors and MGM/UA. The contract and tort claims contained in counts three through seven are separate from the claims underlying the other counts. Defendants have not shown that resolution of claims arising from the Letter Agreement and the implied agreements could not fully be obtained without the presence of the foreign defendants. Similarly, the foreign defendants' remoteness from the contractual rights at issue in counts three through seven preclude a finding either that their interests will be impaired or that the plaintiff or remaining defendants will be subject to multiple litigation. Since the foreign defendants are not parties to the Letter Agreement or the implied agreements, it is difficult to imagine a situation in which MGM/UA or UA will successfully defend this action and yet, as defendants contend, be liable to the foreign defendants *for the same contractual obligations* on a cross-claim in a later action. Thus, insofar as counts three through seven are based upon the Letter Agreement or implied obligations existing solely between plaintiff or its assignors on the one hand and MGM/UA and/or UA on the other hand, this Court denies the motion to dismiss for failure to join the foreign defendants.

## III. *Statute of Limitations*

■ The motion to dismiss counts three through seven on statute of limitations grounds is denied. The Court finds that plaintiff has stated sufficient facts to allow the statute of limitations issue to proceed to summary judgment or trial.

Defendants rely upon *Rutledge v. Boston Woven Hose and Rubber Co.*, 576 F.2d 248 (9th Cir.1978), in arguing that plaintiff has failed to state with the requisite particularity its inability to discover until recently the alleged wrongdoings. This case is inapplicable to the case at bar for two reasons. First, it appears from the Complaint that some of the alleged breaches or tortious acts occurred within the applicable limitations period. For example, in paragraph 53(d) of the Complaint, plaintiff alleges that portions of the participations were withheld from plaintiff or its assignors from March 1979 through November 1983. Clearly a claim for a portion of these participations, namely those due within the applicable limitations period, would have been brought in a timely fashion. Second, although such paragraphs as paragraph 55 of the Complaint are too vague to satisfy the *Rutledge* requirement, the Complaint must be read as a whole to determine if the requisite particularity is alleged. When reading the Complaint in this broader light, plaintiff has stated the concealment and its inability to discover the wrongdoings with the requisite specificity. One means through which this particularity requirement is met are the allegations supporting a finding that defendants are a fiduciary under the profit participation plan. Plaintiff has stated sufficient facts to justify a finding that defendants have certain fiduciary obligations under California law as articulated in *Nelson v. Abraham*, 29 Cal.2d 745, 177 P.2d 931 (1947). As such, defendants may have had an obligation to disclose certain information concerning the alleged wrongdoings to plaintiff. This would relieve plaintiff of the obligation of asserting affirmative acts taken by defendants to conceal the truth from plaintiff. In *Rutledge*, the Ninth Circuit found: "Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure." 576 F.2d

at 250. Plaintiff has alleged sufficient facts to surpass the motion to dismiss hurdle. Questions of fact, however, remain to be resolved concerning plaintiff's exercise of due diligence, the extent of a fiduciary relationship that may exist, and the affirmative acts that defendants may have taken to conceal their wrongdoings.

IV. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

 The Court denies the motion to dismiss this sixth cause of action. California law in this area is in a great state of flux, with significant reliance apparently being placed upon the specific factual situation presented. For this reason, the Court believes that plaintiff has stated a claim for relief under California law and further factual development should take place.

Although the California Supreme Court in *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.,* 36 Cal.3d 752, 206 Cal. Rptr. 354, 686 P.2d 1158 (1984), ultimately sidestepped the issue concerning the extent of a tort claim for breach of the implied covenant of good faith and fair dealing, the Court did provide some useful guidance. Insurance claims founded upon breach of this implied covenant were described as sounding in tort because of "the 'special relationship' between insurer and insured, characterized by elements of public interest, adhesion, and fiduciary responsibility." Id. at 768, 206 Cal.Rptr. 354, 686 P.2d 1158. The Court then noted that there was "[n]o doubt [that] there are other relationships with similar characteristics and deserving of similar treatment," Id. at 769, 206 Cal. Rptr. 354, 686 P.2d 1158, and in a footnote observed that the employment relationship may be such an example since it had "*some* of the same characteristics as the relationship between insurer and insured." Id. at n. 6 (emphasis added). Although such language is pure dicta, it does offer some insight into the future of this tort action. In the case at bar, Connery's relationship with defendants can certainly be viewed as one arising out of an employment context. Certain public interests and fiduciary obligations may be inherent in such a relationship. Although there has been no allegation that the contract was adhesive in nature, sufficient elements of a special relationship have been pled to meet the Rule 12(b)(6) standard of stating a claim upon which relief can be granted.