SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

MUTUAL BENEFITS CORP., Joel
Steinger a/k/a Joel Steiner, Leslie
Steinger a/k/a Leslie Steiner, and Pe-
ter Lombardi, Defendants,

Viatical Benefactors, LLC, Viatical Ser-
vices, Inc., Kensington Management,
Inc., Rainy Consulting Corp., Twin
Groves Investments, Inc., P.J.L. Con-
sulting, Inc., SKS Consulting, Inc.,
and Camden Consulting, Inc., Relief
Defendants.

No. 04–60573.

United States District Court,
S.D. Florida,
Miami Division.

June 25, 2004.

Teresa J. Verges, Esq., Alise M. John-
son, Esq., Cheldy C. Dumornay, Esq., Lin-
da S. Schmidt, Esq., Ryan D. O'Quinn,
Esq., Securities and Exchange Commis-
sion, Miami, FL, Roberto Martinez, Esq.,
Colson Hickes Edison, Coral Gables, Lau-
rel M. Isicoff, Esq., Kenneth R. Hartmann,
Esq., David P. Milian, Esq., Kozyak Tro-
pin & Throckmorton, P.A., Miami, FL, for
Plaintiff.

Bruce A. Zimet, Esq., Fort Lauderdale,
FL, Richard Ben–Veniste, Esq., Mayer,
Brown, Rowe & Maw LLP, Chicago, IL,
Benedict P. Kuehne, Esq., Jon A. Sale,
Esq., Sale & Kuehne, Faith E. Gay, Esq.,
Lee Rubin, Esq., White & Case, LLP,
Miami, FL, for Defendant.

*ORDER DENYING DEFENDANTS'
MOTION TO DISMISS FOR LACK
OF SUBJECT MATTER JURISDIC-
TION*

MORENO, District Judge.

Before the Court is an action com-
menced by the Securities and Exchange
Commission for the violation of various
federal securities regulations in the trade
of life insurance policies of terminally ill
people. Presently, the Court is called
upon to decide whether the sale of these
"viatical settlements" is beyond the scope
of the federal securities laws. Specifically,
Defendants contend that investments in
viatical settlements are not investment
contracts and as a result, the Securities
and Exchange Commission has no jurisdic-
tion to assert its claims. The Court here
finds that, in light of the underlying princi-
ples of the federal securities laws, invest-
ments in viatical settlements are covered
by the federal securities laws.

## I. BACKGROUND

Defendant Mutual Benefit Corporation
("MBC") is a Florida corporation, formed

in 1994 and located in Fort Lauderdale, Florida. Defendants Joel and Leslie Steinger are alleged principals of MBC. Defendant Peter Lombardi is president and sole shareholder of MBC.

In addition, the Securities and Exchange Commission ("SEC") has named the following parties as Relief Defendants: Viatical Benefactors, LLC; Viatical Services, Inc. ("VSI"); Kensington Management, Inc.; Rainy Consulting Corp.; Twin Groves Investment, Inc.; P.J.L. Consulting, Inc.; SKS Consulting, Inc.; and Camden Consulting, Inc. The SEC alleges that Relief Defendants are shell corporations controlled by Defendants or their family members. Complaint at ¶ 2. Further, the SEC alleges that investor funds were distributed to Relief Defendants in the form of "undisclosed 'consulting fees.'" *Id.*

## A. Viatical Settlement Industry

A viatical settlement is a transaction in which a terminally or chronically ill insured ("viator") sells the benefits of his life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value.[1] Viatical settlement providers purchase the policies from individual viators. Once purchased, these viatical settlement providers typically sell fractionalized interests in these policies to investors.

## B. MBC's Activities

MBC is a viatical settlement provider.[2] MBC engages in both the procurement of viatical settlements and the sale of fractional interests in them to investors. Beginning in 1994 and extending to May, 2004, over 29,000 investors nationwide have invested over $1 billion in interests of

viatical settlements offered by MBC. From the procurement of the settlements to the sale to investors, MBC undertook a number of activities.

With respect to the procurement of the viatical settlements, MBC located the policies, negotiated purchase prices, bid on policies, and obtained life expectancy evaluations of individual viators. In addition, it appears that MBC created the legal documents needed to conclude the transactions.

In order to sell the viatical settlements to investors, MBC solicited funds from investors directly and through agents. Investors were asked to identify a desired maturity date and submit a purchase agreement. MBC promised rates of return ranging from 12% to 72%. The rate of return was dependent upon the term of the investment, which was determined by the life expectancy evaluation. If the viator lives beyond his life expectancy, the term of the investment is extended and the premiums must either be paid from new investor funds assigned to other policies or by additional funds from the original investors.

Finally, following the placement of investor funds, MBC, through VSI, would pay the premiums, monitor the health of viators, collect the benefits upon death, and distribute the proceeds to investors.

## C. SEC Enforcement

Plaintiff SEC filed its Complaint for Injunctive and Other Relief on May 3, 2004, alleging violations of various federal securities laws by Defendants Mutual Benefits Corporation, Joel Steinger, Leslie Steinger and Peter Lombardi. The Court entered

---

1. *Black's Law Dictionary* 1377 (7th Ed.1999).

2. MBC is also a life settlement provider. The only distinction between life settlements and viatical settlements is that in life settlements, the insured is not terminally or chronically ill. For purposes of this order, the Court does not distinguish between viatical and life settlements.

a Temporary Restraining Order and an Order Appointing Receiver on May 4, 2004, and set an evidentiary hearing on Plaintiff's Motion for Preliminary Injunction on May 17, 2004. At the insistence of the parties, the Court continued the evidentiary hearing until June 10, 2004, at which time the parties presented evidence on the issue of whether or not the activities of Defendants are covered by the federal securities laws. In particular, the Court heard evidence on the issue of whether an investment in a viatical settlement constitutes an investment contract.

## II. LEGAL ANALYSIS

The narrow issue before the Court is whether investments in viatical settlements constitute securities. Defendants petition the Court to dismiss the present action because they argue such investments are not covered by the federal securities laws, and as a result, this Court lacks subject matter jurisdiction. After carefully reviewing the numerous pleadings from the parties and surveying the relevant statutory and jurisprudential sources on the topic of the definition of a security, the Court has come to the conclusion that investments in viatical settlements constitute investment contracts, and as such, fall under the coverage of the federal securities laws.

### A. Jurisdictional Standard

At the preliminary injunction stage, the SEC need only show a reasonable probability of ultimate success upon the question of the SEC's jurisdiction over the Defendants' conduct. *SEC v. Unique Financial Concepts, Inc., et al.*, 196 F.3d 1195, 1199 (11th Cir.1999).

### B. Historical Background of the Federal Securities Laws

From September 1, 1929 through the end of October of the same year, the aggregate value of stocks listed on the NYSE fell from $89 billion to $18 billion.[3] Enacted in the early 1930's, the federal securities laws came in direct response to the stock market crash of late 1929 and the resulting depression that forged a political consensus in Congress to regulate securities. As noted by the Supreme Court, " '[i]t requires but little appreciation . . . of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry." *SEC v. Capital Gains Research* Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)(*quoting Silver v. New York Stock Exchange*, 373 U.S. 341, 366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963)).

Underpinning the complicated statutory framework of the federal securities laws are two unifying principles, repeated time and again in numerous Supreme Court opinions, that serve to guide courts in interpreting the law's application. After a survey of the relevant case law, the Court has identified the principle of flexibility in the law's application and the principle of full disclosure in the law's remedial thrust.

First and foremost, the federal securities laws were drafted and have consistently been interpreted from the perspective that flexibility in the law's applicability is paramount. In its seminal case on the interpretation of the term "investment contract", the Supreme Court declared that Congress purposefully gave a broad definition to what constitutes a security. *SEC v. W.J. Howey Company*, 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244

**3.** See J. SELIGMAN, *The Transformation of Wall Street: A History of the Securities and* *Exchange Commission and Modern Corporate Finance* 39–42 (3d ed.2003).

(1946) (warning that the "statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae"); *see also Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (noting that "remedial legislation should be construed broadly to effectuate its purposes"), *Pinter v. Dahl,* 486 U.S. 622, 652, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Moreover in *Reves v. Ernst & Young,* the Court explained that the securities laws should be interpreted "against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." 494 U.S. 56, 63, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Through *Howey* and its progeny, the Supreme Court has consistently repeated the interpretive principle that courts should determine the contours of the term "security" from the posture that substance should be elevated over form, with a special sensitivity to the economic reality of the transaction, not its formal characteristics. *See Tcherepnin,* 389 U.S. at 336, 88 S.Ct. 548.

In addition to the principle of flexibility, the second unifying principle of the federal securities laws for courts to consider is the strong preference for full disclosure. Indeed, the remedial thrust of the federal securities laws is to establish full disclosure, not risk-free investment. *See SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (holding that the primary purpose of the federal securities laws is to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* "); *see also Tcherepnin,* 389 U.S. at 336, 88 S.Ct. 548.

Prior to the adoption of the federal securities laws, there existed a divergence of opinion on the remedial goal of any securities regulation. The split of opinion was divided between those who sought to impose a merit standard on securities and those who preferred a disclosure requirement. Eventually, the disclosure philosophy gained political momentum and became the principle remedial thrust of the federal securities laws.[4] An important advocate of the philosophy of full disclosure was Louis D. Brandeis, who wrote, in his seminal piece, *Other People's Money,* that "[s]unlight is said to be the best of disinfectants; electric light the most efficient policeman." [5]

Tempering the policies of flexibility and full disclosure, the Court recognizes that Congress did not aim to create a broad federal remedy for fraud. *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).

## C. Defining the Scope of the Federal Securities Laws

Under the Securities Act of 1933, Congress defined a "security" as including investment contracts. 15 U.S.C. § 77b(a)(1). The term "investment contract" was derived from various state legislation that predated the federal securities laws in what were called "blue sky laws". 1 L. Loss & J. Seligman, *Securities Regulation* 31–43 (3d ed.1998). Indeed the first securities regulation in the nation began at the turn of the twentieth century with the enactment of the "blue sky laws".[6] Under these early state regulations, an investment contract was defined as a transaction

---

4. *Id.*

5. Louis D. Brandeis, *Other People's Money,* Ch. 5 (1914).

6. The term appears to have originated from the speculative schemes that these early laws

intended to prevent that "had no more basis than so many feet of blue sky". *State v. Gopher Tire & Rubber Co.,* 146 Minn. 52, 177 N.W. 937, 938 (1920) (*citing Hall v. Geiger–Jones Co.* 242 U.S. 539, 550, 37 S.Ct. 217, 61 L.Ed. 480 (1917)).

that placed capital "in a way intended to secure income or profit from its employment." *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 177 N.W. 937, 938 (1920).

Like the state legislatures that first attempted to regulate investment contracts under the "blue sky laws", Congress also refused to narrowly define the term "investment contract" in favor of offering great latitude to courts to "meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. 1100. The Supreme Court in *Howey* set out the classic test for determining when a transaction is properly characterized as an investment contract that falls within the ambit of the federal securities laws. *See SEC v. Edwards*, 540 U.S. 389, 124 S.Ct. 892, 896, 157 L.Ed.2d 813 (2004); *see also* Cristina Moreno, Comment, *Discretionary Accounts*, 32 Miami L.Rev. 401, 405 (1977). Moreover, the Eleventh Circuit has interpreted the *Howey* test to comprise the following three elements: (1) an investment of money; (2) a common enterprise; and (3) the expectation of profits derived solely from the efforts of others. *Unique Financial Concepts, Inc.*, 196 F.3d at 1199 (*citing Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir.1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir. 1984)).

Specifically, Defendants move the Court to dismiss the present action for lack of subject matter jurisdiction because investments in viatical settlements fail to meet the second and third elements of the test set forth in *Howey*.

### 1. Commonality

Defendants contend that investments in viatical settlements do not satisfy the second prong of *Howey*, requiring that the investment be in a common enterprise.

Specifically, Defendants argue that "horizontal commonality" is not present in investments in viatical settlements because the necessary interdependency among investors is lacking.

The Court notes however that there exists a split among the circuits on the appropriate test for commonality. The Defendants cite the precedent from the Seventh Circuit in support of the more stringent requirement of "horizontal commonality". Defendants' Motion to Dismiss at 13 (citing *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016 (7th Cir.1994)). However, the Eleventh Circuit has adopted the test of "vertical commonality", which does not require the pooling of investor funds or the *pro rata* distribution of profits. *See Unique Financial Concepts*, 196 F.3d 1195, 1199 n. 4 (11th Cir.1999).

Under the vertical commonality standard, all that is required is for the success of the investors to be dependent on the success of the investment promoters' efforts to secure a return. *Id.* at 1200. Here, investors' return is highly dependent on MBC's efforts because the investors rely on MBC's skill in locating, negotiating, bidding, and evaluating policies. As a result, the Court finds that investments in viatical settlements satisfy the commonality requirement of *Howey*, as interpreted by the Eleventh Circuit.

### 2. Expectation of profits derived solely from the efforts of others

Defendants second and more substantial contention is that investments in viatical settlements do no satisfy *Howey's* third prong. On this issue, the Court holds that investments in viatical settlements satisfy the third prong of *Howey* that there be an expectation of profits derived solely from the efforts of others. In light of the principles informing the federal securities

laws, repeated time and again by the Supreme Court, coupled with the nature of the relationship between the promoters and the investors in viatical settlements, the Court is convinced that the nature of the transaction is an investment contract.

### (a) Promoters' efforts versus external market forces

In order to satisfy the third prong of *Howey*, investments must be substantively passive and depend on the "entrepreneurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The key determination is whether it is the promoters' efforts, not that of the investors, that form the "essential managerial efforts which affect the failure or success of the enterprise." *Unique Financial Concepts*, 196 F.3d at 1201 (*citing SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973)).

It is important to note that the original requirement that profits be derived "solely" from the efforts of others has been modified by later opinions to include only that the efforts of others be merely predominant. The Eleventh Circuit has adopted the view that the inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique Financial Concepts*, 196 F.3d at 1201 (adopting the reasoning of *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974)).

Taken together, the case law seems to indicate that the key question for a court in assessing whether a transaction satisfies

the third prong of *Howey* is to determine whether profits are derived from the activities of the promoter or rather, the operation of external market forces beyond the control of the promoter. The obvious reason for making such a distinction is because the securities laws disclosure requirements will only protect investments that depend on the efforts of promoters, not those that depend on the operation of external market forces. *See SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649, 652 (6th Cir.1982). Defendants here contend that with respect to investments in viatical settlements, profits are determined by the purely external force of the time of the viator's death.

Without question, the timing of the viator's death is of great consequence in the realization of the investors' profits. However, investors' profits are not determined by the timing of the viator's death. Rather, profits from investments in viatical settlements are determined by whether MBC's life expectancy evaluation is correct. Here, MBC located policies, evaluated viators' life expectancies, bid on policies, and negotiated the purchase price of policies. The profitability of investments in these viatical settlements is wholly determined by the efforts of the promoters in evaluating life expectancies. In investments in viatical settlements, the investor only chooses the desired term of investment. MBC matches the investors' funds with viators' policy whose life expectancies match the investors' desired term of investment. The longer a viator lives beyond his life expectancy, as evaluated by MBC, the lower the investors' profits. The investors plainly rely on MBC's life expectancy evaluations.[7]

---

7. Carole C. Lamson, *Legal Introduction in Living Benefits in Life Insurance: New Perspectives and Developments*, N.Y. St. B.J., Nov. 1993, at 16, 17 (1993)(noting that primary risk involved in investments in viatical settlements is the misestimation of viators' life expectancies).

### (b) *Life Partners'* bright-line rule

Defendants urge the Court to follow the D.C. Circuit opinion of *SEC v. Life Partners, Inc.*, 87 F.3d 536 (D.C.Cir.1996), which created a bright-line rule that promoters' entrepreneurial and managerial efforts must occur post-purchase in order to satisfy the third prong of *Howey*. Of special import is the fact that *Life Partners* is the only federal appellate court to decide the issue of whether an investment in a viatical settlement is a security.[8]

Nevertheless, the Court is uncomfortable with the bright-line rule enunciated by the D.C. Circuit and must decline Defendants' invitation to adopt a rule that is inconsistent with the policies underlying the federal securities laws and misconceives the nature of investments in viatical settlements.[9]

Bright-line rules are discouraged in the context of federal securities laws for the reason that they tend to create loopholes that can be used by the clever and dishonest. Indeed, the bright-line rule enunciated in *Life Partners* created a loophole, which became the Defendants' corporate structure model. Anthony Livoti, trustee for MBC, testified in his deposition that the "attorneys of Mutual Benefits were cognizant of the SEC vs. Life Partners case." Livoti depo. at 12. Indeed counsel for MBC, Michael McNerney, testified at the evidentiary hearing that MBC attempted to restructure certain portions of their operations to conform to the D.C. Circuit's ruling in *Life Partners*. See also Livoti depo. at 12–13.

The Supreme Court gave the following rationale for the statutory and jurisprudential policy of flexibility in the context of determining the coverage of the federal securities laws:

> Such an approach has the corresponding advantage, though, of permitting the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition. *Reves*, 494 U.S. at 63 n. 2, 110 S.Ct. 945.

Further, in arriving at its bright-line rule distinguishing between pre and post purchase activities, the D.C. Circuit relied heavily on the Ninth Circuit case of *Noa v. Key Futures, Inc.*, 638 F.2d 77 (1980). However, the investments in *Noa* appear factually dissimilar from investments in viatical settlements. *Noa* involved investments in silver bars which the promoter had located, promised to store, and promised to repurchase at the published spot price. *Life Partners*, 87 F.3d at 546 (describing facts of *Noa v. Key Futures, Inc.*, 638 F.2d 77 (1980)). The Ninth Circuit found that the investments' profitability depended on the external market forces affecting the silver market. *Noa*, 638 F.2d at 79–80. Remarkably, the D.C. Circuit read into the holding of *Noa* implicit support for the irrelevance of pre-purchase efforts. *Life Partners*, 87 F.3d at 546. Indeed, a fair reading of *Noa* reveals no such distinction between pre and post-purchase activities.

---

**8.** The SEC has advanced the position that even if the Court were to adopt the bright-line rule of *Life Partners*, MBC's significant entrepreneurial and managerial post-purchase activities would still satisfy the third prong of *Howey*. Defendants dispute the contention. Because the Court declines to follow *Life Partners*, the Court need not reach the issue of timing.

**9.** Although *Life Partners* is the only federal appellate decision on the issue, the Court notes that other courts have refused to follow *Life Partners*, See, e.g., *Wuliger v. Christie*, 310 F.Supp.2d 897 (N.D.Ohio 2004)(rejecting the D.C. Circuit's analysis as unpersuasive).

Finally, at closing argument, Defendants advanced the position that rejecting the *Life Partners* approach and adopting a flexible interpretation of the definition of an investment contract would be the equivalent of this Court's substitution of its own will for that of Congress. The Court disagrees with Defendants' well-argued position. The Court rejects *Life Partners'* bright-line rule not out of a wish to substitute its will over that of Congress, but rather, in fidelity to the statutory and jurisprudential principles that underpin the federal securities laws. Informing the Court's decision is the Supreme Court's declaration that: "[o]ne could question whether, at the expense of the goal of clarity, Congress overvalued the goal of avoiding manipulation by the clever and dishonest. If Congress erred, however, it is for that body, and not this Court, to correct its mistake." *Reves*, 494 U.S. at 63 n. 2, 110 S.Ct. 945. In light of the language of *Reves*, the Court must reject the bright-line rule laid down by judges in *Life Partners* in order to effectuate the mandate of Congress.

### III. CONCLUSION

In holding that investments in viatical settlements constitute securities for purposes of the federal securities laws, the Court has endeavored to rule in accordance with the underpinning principles of the federal securities laws laid out by Congress and interpreted time and again by the highest court in the land, the Supreme Court. Essentially the inquiry turns on whether the profits from the investment are derived predominantly from the efforts of others. In light of the significant entrepreneurial and managerial efforts involved in locating, negotiating, and performing life expectancy evaluations, the Court is convinced that investments in viatical settlements constitute investment contracts under the classic standard set out in *Howey* and as a result, fall under the coverage

of the federal securities laws. Accordingly, it is

**ADJUDGED** that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (**D.E. No. 100**), filed on *June 3, 2004* is **DENIED**. Further, it is

**ADJUDGED** that pursuant to 28 U.S.C. § 1292(b), the Court hereby certifies that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of the action.